BROWN, DIRECTOR, DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVISION OF GAMING ENFORCEMENT, STATE OF NEW JERSEY, ET AL. *v.* HOTEL & RESTAURANT EMPLOYEES & BARTENDERS INTERNATIONAL UNION LOCAL 54 ET AL.

No. 83–498.   Argued March 26, 1984—Decided July 2, 1984*

---

*Together with No. 83–573, *Danziger, Acting Chairman, Casino Control Commission of New Jersey, et al.* v. *Hotel & Restaurant Employees & Bartenders International Union Local 54 et al.*, also on appeal from the same court.

492

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN and REHNQUIST, JJ., joined. WHITE, J., filed a dissenting opinion, in which POWELL and STEVENS, JJ., joined, *post*, p. 513. BRENNAN and MARSHALL, JJ., took no part in the decision of the cases.

*Anthony J. Parrillo*, Assistant Attorney General of New Jersey, argued the cause for appellants. With him on the briefs for appellants in No. 83–498 were *Irwin I. Kimmelman*, Attorney General, and *Gary A. Ehrlich* and *Eugene M. Schwartz*, Deputy Attorneys General. *Robert J. Genatt* and *John R. Zimmerman* filed briefs for appellants in No. 83–573.

*Laurence Gold* argued the cause for appellees. With him on the brief were *Bernard N. Katz, Michael N. Katz*, and *George Kaufmann*.†

JUSTICE O'CONNOR delivered the opinion of the Court.

In 1976, the citizens of New Jersey amended their State Constitution to permit the legislative authorization of casino

---

†*Brian McKay*, Attorney General, filed a brief for the State of Nevada as *amicus curiae* urging reversal.

*David Previant* and *Robert M. Baptiste* filed a brief for the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the Atlantic City Casino Hotel Association et al. by *William F. Kaspers;* and for the National Right to Work Legal Defense Foundation by *Rex H. Reed* and *Glenn M. Taubman*.

gambling within the municipality of Atlantic City.[1] Determined to prevent the infiltration of organized crime into its nascent casino industry and to assure public trust in the industry's integrity, the New Jersey Legislature enacted the Casino Control Act (Act), N. J. Stat. Ann. § 5:12–1 *et seq.* (West Supp. 1983–1984), which provides for the comprehensive regulation of casino gambling, including the regulation of unions representing industry employees. Sections 86 and 93 of the Act specifically impose certain qualification criteria on officials of labor organizations representing casino industry employees. Those labor organizations with officials found not to meet these standards may be prohibited from receiving dues from casino industry employees and prohibited from administering pension and welfare funds. The principal question presented by these cases is whether the National Labor Relations Act (NLRA), as amended, 29 U. S. C. § 141 *et seq.*, precludes New Jersey from imposing these criteria on those whom casino industry employees may select as officials of their bargaining representatives. We hold that it does not.

## I

## A

The advent of casino gambling in New Jersey was heralded with great expectations for the economic revitalization of the

---

[1] That amendment provides in part:

"It shall be lawful for the Legislature to authorize by law the establishment and operation, under regulation and control by the State, of gambling houses or casinos within the boundaries, as heretofore established, of the city of Atlantic City, . . . and to license and tax such operations and equipment used in connection therewith. Any law authorizing the establishment and operation of such gambling establishments shall provide for the State revenues derived therefrom to be applied solely for the purpose of providing reductions in property taxes, rentals, telephone, gas, electric, and municipal utilities charges of, eligible senior citizens and disabled residents of the State . . . ." N. J. Const., Art. 4, § 7, ¶ 2D.

A subsequent amendment permits revenues to be used as well to provide health and transportation benefits for eligible senior citizens and disabled residents. *Ibid.*

Atlantic City region, but with equally great fears for the potential for infiltration by organized crime. The state legislature conducted extensive hearings and, in cooperation with the Governor, commissioned numerous studies on how best to prevent infiltration by organized crime into the casino industry.[2] These studies confirmed the fact that the vast amount of money that flows daily through a casino operation and the large number of unrecorded transactions make the industry a particularly attractive and vulnerable target for organized crime. The New Jersey Commission of Investigation (NJCI), for example, found that there was a "well-organized highly functional organized crime network in [New Jersey]" which had become more interested in investing funds in legitimate enterprises.[3] The NJCI feared that such an incursion by organized crime into the Atlantic City casinos might also be accompanied by extortion, loansharking, commercial bribery, and tax and antitrust violations. It was on the basis of these hearings and empirical studies that New Jersey finally adopted the Act, a comprehensive statutory scheme that authorizes casino gambling and establishes a rigorous system of regulation for the entire casino industry.

In order to promote "public confidence and trust in the credibility and integrity of the regulatory process and of

---

[2] See generally Cohen, The New Jersey Casino Control Act: Creation of a Regulatory System, 6 Seton Hall Legis. J. 2–5 (1982); Note, The Casino Act: Gambling's Past and the Casino Act's Future, 10 Rutgers-Camden L. J. 279 (1979).

[3] See NJCI, Report and Recommendations on Casino Gambling 1C–2C (1977). Most relevant to these cases, this study specifically noted:

"[E]xperience and collected intelligence regarding organized crime strongly suggests [sic] that there are few better vehicles utilized by organized crime to gain a stranglehold on an entire industry than labor racketeering. Organized crime control of certain unions often requires the legitimate businessmen who employ the services of the union members to pay extra homage to the representatives of the underworld. Moreover the ready source of cash which union coffers provide can be employed as financing of all sorts of legitimate or illicit ventures." Id., at 1–H.

casino operations," the Act "extend[s] strict State regulation to all persons, locations, practices and associations related to the operation of licensed casino enterprises and all related service industries." N. J. Stat. Ann. § 5:12–1(b)(6) (West Supp. 1983–1984). The Casino Control Commission (Commission), an independent administrative body, possesses broad regulatory authority over the casinos and other related industries, §§ 5:12–63 to 5:12–75. The Division of Gaming Enforcement (Division), a part of the Attorney General's Office, is charged with the responsibility for investigating license and permit applicants and for prosecuting violators of the Act, §§ 5:12–76 to 5:12–79.

The Act imposes strict licensing requirements on any business seeking to own and operate a casino hotel, §§ 5:12–84(a)–(c); on suppliers of goods and services to casino hotels, §§ 5:12–12, 5:12–92; on all supervisory employees involved in casino operations, §§ 5:12–9, 5:12–89; and on all employees with access to the casino floor, §§ 5:12–7, 5:12–90. The Act requires registration, rather than licensing, for employees of casino hotels. Casino hotel employees include those performing "service or custodial duties not directly related to operations of the casino, including, without limitation, bartenders, waiters, waitresses, maintenance personnel, kitchen staff, but whose employment duties do not require or authorize access to the casino." § 5:12–8. Most relevant to this litigation, § 93(a) of the Act also requires labor organizations that represent or seek to represent persons employed in casinos or casino hotels to register annually with the Commission, § 5:12–93(a).

All those entities and persons required to be licensed or registered are subject to the disqualification criteria set forth in § 86 of the Act. Section 86 specifically lists criteria for the disqualification of casino licensees. The Commission is authorized to revoke, suspend, limit, or otherwise restrict the registration of any casino hotel employees who would be disqualified for a casino license. N. J. Stat. Ann. §§ 5:12–86, 5:12–91(b) (West Supp. 1983–1984). All industries offering

goods or services to the casinos are also subject to the disqualification criteria of § 86.    § 5:12–92.

Section 93(b) directly subjects registered labor organizations to the § 86 disqualification criteria and imposes two express penalties for noncompliance:

"No labor organization, union or affiliate registered or required to be registered pursuant to this section and representing or seeking to represent employees licensed or registered under this act may receive any dues from any employee licensed or registered under this act and employed by a casino licensee or its agent, or administer any pension or welfare funds, if any officer, agent, or principal employee of the labor organization, union or affiliate is disqualified in accordance with the criteria contained in section 86 of this act.    The commission may for the purposes of this subsection waive any disqualification criterion consistent with the public policy of this act and upon a finding that the interests of justice so require."

The disqualification criteria referred to in § 86 include convictions for a list of enumerated offenses or "any other offense which indicates that licensure of the applicant would be inimical to the policy of this act and to casino operations." N. J. Stat. Ann. § 5:12–86(c)(4) (West Supp. 1983–1984). Disqualification may also result if an individual is identified "as a career offender or a member of a career offender cartel or an associate of a career offender or career offender cartel in such a manner which creates a reasonable belief that the association is of such a nature as to be inimical to the policy of this act and to gaming operations."    § 5:12–86(f).[4]

---

[4] A "career offender," in turn, is defined as "any person whose behavior is pursued in an occupational manner or context for the purpose of economic gain, utilizing such methods as are deemed criminal violations of the public policy of this State."    N. J. Stat. Ann. § 5:12–86(f) (West Supp. 1983–1984).

B

Appellee Hotel and Restaurant Employees and Bartenders International Union Local 54 (Local 54) is an unincorporated labor organization within the meaning of § 2(5) of the NLRA, 29 U. S. C. § 152(5). Local 54 represents in collective bargaining approximately 12,000 employees, 8,000 of whom are employed in casino hotels in Atlantic City. All of Local 54's casino hotel employees work in traditional hotel and restaurant service-related positions; none are employed in direct gambling operations. Appellee Frank Gerace is the president of Local 54.

In 1978, Local 54 began filing with the Commission the annual registration statement required by § 93(a) of the Act. Following a lengthy investigation, the Division in 1981 reported to the Commission that, in its view, Local 54's President Gerace, Secretary-Treasurer Robert Lumio, and Grievance Manager Frank Materio were disqualified under the criteria of § 86. Pursuant to that section, the Commission scheduled a hearing on the Division's allegations. When Local 54 raised objections to the constitutionality of § 86 and § 93, the Commission ruled that it lacked the authority to consider such challenges to its enabling statute. In response, appellees filed a complaint in District Court,[5] seeking declaratory and injunctive relief on the grounds that § 86 and § 93 impermissibly regulate areas which are preempted by the NLRA, the Employee Retirement Income Security Act (ERISA), 29 U. S. C. § 1001 et seq., and the Labor-Management Reporting and Disclosure Act of 1959

[5] Defendants in that action, now appellants before this Court, included G. Michael Brown, the Director of New Jersey's Department of Law and Public Safety, Division of Gaming Enforcement; the Division itself; and Thomas Kean, Governor of New Jersey. These appellants filed an appeal in No. 83–498, and are referred to collectively as appellant Division. Also defendants below were Martin Danziger, Acting Chairman of the Commission, along with the other members constituting the Commission. These appellants are referred to as appellant Commission, and their appeal, No. 83–573, has been consolidated with No. 83–498.

(LMRDA), 29 U. S. C. § 401 *et seq.*, and that § 86(f) violates the Constitution because it is both overbroad and vague. Appellees also filed a motion for preliminary injunctive relief alleging irreparable injury from being forced to participate in further Commission proceedings.

After a hearing, the District Court denied the motion for a preliminary injunction, concluding that appellees were unlikely to succeed on the merits of their claims.[6]  536 F. Supp. 317 (NJ 1982).  Since no preliminary injunction was entered, the Commission went forward with its disqualification hearing.  The Commission concluded that Gerace and Materio were disqualified under § 86(f) because they were associated with members of organized crime in a manner inimical to the policy of the Act and to gaming operations.  Local 54's Business Agent, Karlos LaSane, was also held disqualified under § 86(c) because he had been convicted in 1973 of extortion from persons doing business with Atlantic City while he was a City Commissioner.[7]  On the basis of its findings, the Commission ordered that these individuals be removed as officers, agents, or principal employees of Local 54, failing which Local 54 would be barred from collecting dues from any of its members who were licensed or registered employees under the Act.  See App. to Juris. Statements 206a–207a. The Commission later issued a supplemental decision, determining that the prohibition against dues collection would suffice to effectuate the removal of the three union officials and that it was therefore unnecessary to invoke the additional sanction of prohibiting the disqualified officials from administering pension and welfare funds.  *Id.*, at 208a–215a.

---

[6] Appellants had in turn moved to dismiss the complaint on abstention grounds, relying on the various strands of that doctrine as enunciated in *Railroad Comm'n of Texas* v. *Pullman Co.*, 312 U. S. 496 (1941); *Burford* v. *Sun Oil Co.*, 319 U. S. 315 (1943); and *Younger* v. *Harris*, 401 U. S. 37 (1971).  The District Court concluded that none of these abstention doctrines was applicable to this case.  536 F. Supp. 317, 324–325 (NJ 1982).

[7] One of the officials earlier identified in the Division's report, Secretary-Treasurer Lumio, died in June 1981, prior to the Commission's decision.

Subsequent to the Commission's decision, a divided panel of the United States Court of Appeals for the Third Circuit issued a ruling concluding that the District Court had erred in refusing to grant the preliminary injunction. 709 F. 2d 815 (1983). Reaching the merits of the underlying complaint, the court decided that § 93 of the Act is pre-empted by § 7 of the NLRA insofar as it empowers the Commission to disqualify elected union officials and is pre-empted by ERISA insofar as it empowers the Commission to prohibit administration of pension and welfare funds.[8]

We noted probable jurisdiction, and consolidated the separate appeals of the Commission and the Division to consider the pre-emption issue, 464 U. S. 990 (1983).[9]

## II

When federal pre-emption is invoked under the directive of the Supremacy Clause, it falls to this Court to examine the presumed intent of Congress. See *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta,* 458 U. S. 141, 152–153 (1982).

---

[8] The Court of Appeals also concluded that the District Court was correct in declining to abstain. Because its decision on the NLRA and ERISA pre-emption issues sufficed to dispose of the appeal, the Court of Appeals had no occasion to pass on Local 54's overbreadth and vagueness contentions, nor do we. Local 54 did not challenge on appeal the District Court's decision that LMRDA does not pre-empt the sanctions provided by the Act.

[9] As a preliminary matter, we note appellant Commission's contention that, despite the decision below, the case should still be dismissed under the abstention doctrine of *Younger* v. *Harris, supra.* The New Jersey Attorney General—representing appellants Division, its Director, and the Governor—does not, however, press the *Younger* abstention claim before this Court, and instead submits to the jurisdiction of this Court in order to obtain a more expeditious and final resolution of the merits of the constitutional issue. Brief for Appellant Division 14, n. 6. Since the State's Attorney General has thereby agreed to our adjudication of the controversy, considerations of comity are not implicated, and we need not address the merits of the *Younger* abstention claim. See *Ohio Bureau of Employment Services* v. *Hodory,* 431 U. S. 471, 480 (1977).

Our task is quite simple if, in the federal enactment, Congress has explicitly mandated the pre-emption of state law, see *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 95–100 (1983), or has adequately indicated an intent to occupy the field of regulation, thereby displacing all state laws on the same subject, *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). Even in the absence of such express language or implied congressional intent to occupy the field, we may nevertheless find state law to be displaced to the extent that it actually conflicts with federal law. Such actual conflict between state and federal law exists when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941). See *Michigan Canners & Freezers Assn., Inc.* v. *Agricultural Marketing and Bargaining Board*, 467 U. S. 461, 469 (1984); *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta, supra.*

These pre-emption principles are no less applicable in the field of labor law. Section 7 of the NLRA, 49 Stat. 452, as amended, 29 U. S. C. § 157, the provision involved in this case, neither contains explicit pre-emptive language nor otherwise indicates a congressional intent to usurp the entire field of labor-management relations. See *New York Telephone Co.* v. *New York State Dept. of Labor*, 440 U. S. 519, 540 (1979); *Garner* v. *Teamsters*, 346 U. S. 485, 488 (1953) ("The national . . . Act . . . leaves much to the states, though Congress has refrained from telling us how much"). The Court has, however, frequently applied traditional pre-emption principles to find state law barred on the basis of an actual conflict with § 7. If employee conduct is protected under § 7, then state law which interferes with the exercise of these federally protected rights creates an actual conflict and is pre-empted by direct operation of the Supremacy Clause.

See, *e. g.*, *Nash* v. *Florida Industrial Comm'n*, 389 U. S.
235, 239–240 (1967) (invalidating state unemployment com-
pensation law); *Bus Employees* v. *Missouri*, 374 U. S. 74,
81–82 (1963) (striking down state statute prohibiting peaceful
strikes against public utilities); *Bus Employees* v. *Wisconsin
Board*, 340 U. S. 383, 394 (1951) (same); *Automobile Workers*
v. *O'Brien*, 339 U. S. 454, 458–459 (1950) (invalidating state
"strike-vote" legislation).

Appellants argue that the appropriate framework for pre-
emption analysis in these cases is the balancing test applied
to those state laws which fall within the so-called "local inter-
ests" exception to the pre-emption doctrine first set forth in
*San Diego Building Trades Council* v. *Garmon*, 359 U. S.
236, 243–244 (1959). They contend that because New Jer-
sey's interest in crime control is "so deeply rooted in local
feeling and responsibility," *ibid.*, the Act may yet be sus-
tained as long as the magnitude of the State's interest in the
enactment outweighs the resulting substantive interference
with federally protected rights. See *Operating Engineers* v.
*Jones*, 460 U. S. 669, 683 (1983). This argument, however,
confuses pre-emption which is based on actual federal protec-
tion of the conduct at issue from that which is based on the
primary jurisdiction of the National Labor Relations Board
(NLRB). See, *e. g.*, *Railroad Trainmen* v. *Terminal Co.*,
394 U. S. 369, 383, n. 19 (1969). In the latter situation, a
presumption of federal pre-emption applies even when the
state law regulates conduct only arguably protected by fed-
eral law. Such a pre-emption rule avoids the potential for
jurisdictional conflict between state courts or agencies and
the NLRB by ensuring that primary responsibility for inter-
preting and applying this body of labor law remains with the .
NLRB. See *Motor Coach Employees* v. *Lockridge*, 403
U. S. 274, 286–289 (1971); *San Diego Building Trades Coun-
cil* v. *Garmon, supra*, at 244–245. This presumption of fed-
eral pre-emption, based on the primary jurisdiction rationale,
properly admits to exception when unusually "deeply rooted"

local interests are at stake. In such cases, appropriate consideration for the vitality of our federal system and for a rational allocation of functions belies any easy inference that Congress intended to deprive the States of their ability to retain jurisdiction over such matters. We have, therefore, refrained from finding that the NLRA pre-empts state court jurisdiction over state breach of contract actions by strike replacements, *Belknap, Inc.* v. *Hale*, 463 U. S. 491 (1983), state trespass actions, *Sears, Roebuck & Co.* v. *Carpenters*, 436 U. S. 180 (1978), or state tort remedies for intentional infliction of emotional distress, *Farmer* v. *Carpenters*, 430 U. S. 290 (1977).

If the state law regulates conduct that is actually protected by federal law, however, pre-emption follows not as a matter of protecting primary jurisdiction, but as a matter of substantive right. Where, as here, the issue is one of an asserted substantive conflict with a federal enactment, then "[t]he relative importance to the State of its own law is not material . . . for the Framers of our Constitution provided that the federal law must prevail." *Free* v. *Bland*, 369 U. S. 663, 666 (1962). We turn, therefore, to consider whether New Jersey's Act actually conflicts with the casino industry employees' § 7 rights.

## III

Section 7 guarantees to employees various rights, among them the right "to bargain collectively through representatives of their own choosing." 29 U. S. C. § 157. In a straightforward analysis, the Court of Appeals found that this express right of employees to choose their collective-bargaining representatives encompasses an unqualified right to choose the officials of these representatives. Because § 93(b) of the Act precludes casino industry employees from selecting as union officials individuals who do not meet the § 86 disqualification criteria, the Court of Appeals determined that this provision clearly and directly conflicts with

§ 7 and, under traditional pre-emption analysis, must be held pre-empted.

The Court of Appeals relied heavily on this Court's decision in *Hill* v. *Florida ex rel. Watson,* 325 U. S. 538 (1945), as support for the threshold proposition that § 7 confers an unfettered right on employees to choose the officials of their own bargaining representatives. *Hill* involved a Florida statute that provided for state licensing of union business agents and prohibited the licensing of individuals who had not been citizens for more than 10 years, who had been convicted of a felony, or who were not of "good moral character." The statute also required the unions to file annual reports. Pursuant to this law, the Florida Attorney General obtained injunctions against a union and its business agent, restraining them from functioning until they had complied with the statute.

On review, the Court found that Florida's statute as applied conflicted with § 7, explaining:

> "The declared purpose of the Wagner Act, as shown in its first section, is to encourage collective bargaining, and to protect the 'full freedom' of workers in the selection of bargaining representatives of their own choice. To this end Congress made it illegal for an employer to interfere with, restrain or coerce employees in selecting their representatives. Congress attached no conditions whatsoever to their freedom of choice in this respect. Their own best judgment, not that of someone else, was to be their guide. 'Full freedom' to choose an agent means freedom to pass upon that agent's qualifications." 325 U. S., at 541.

The decision in *Hill* does not control the present cases, however, because Congress has, in our view, subsequently disclaimed any intent to pre-empt all state regulation which touches upon the specific right of employees to decide which individuals will serve as officials of their bargaining representatives. As originally enacted, and as interpreted by the

Court in *Hill*, § 7 imposed no restrictions whatsoever on employees' freedom to choose the officials of their bargaining representatives. In 1959, however, Congress enacted the Labor-Management Reporting and Disclosure Act (LMRDA), designed in large part to address the growing problems of racketeering, crime, and corruption in the labor movement. See S. Rep. No. 187, 86th Cong., 1st Sess., 12–16 (1959); H. R. Rep. No. 741, 86th Cong., 1st Sess., 9–12 (1959). Title V of LMRDA imposes various restrictions on labor union officials and defines certain qualifications for them. Specifically, 29 U. S. C. § 504(a) provides in pertinent part:

> "No person . . . who has been convicted of, or served any part of a prison term resulting from his conviction of [a series of enumerated crimes] shall serve . . . as an officer, director, trustee, member of any executive board or similar governing body, business agent, manager, organizer . . . of any labor organization . . . for five years after such conviction or after the end of such imprisonment . . . ."

By enacting § 504(a), Congress has unmistakably indicated that the right of employees to select the officers of their bargaining representatives is not absolute and necessarily admits of some exception. Of course, a strong counterargument can be made that Congress intended § 504(a) to be the very measure of the exception, thereby cutting back on the pre-emptive effect of § 7 only to that extent and no more. Although this is certainly a conceivable reading of congressional intent, we are, however, not persuaded by it.

As the Court has already recognized, another provision of LMRDA, § 603(a),[10] is "an express disclaimer of pre-emption

---

[10] Section 603(a), as set forth in 29 U. S. C. § 523(a), provides:
"Except as explicitly provided to the contrary, nothing in this chapter shall reduce or limit the responsibilities of any labor organization or any officer . . . under any other Federal law or under the laws of any State, and, ex-

of state laws regulating the responsibilities of union officials, except where such pre-emption is expressly provided . . . ." *De Veau* v. *Braisted*, 363 U. S. 144, 157 (1960) (plurality opinion); see also *id.*, at 160–161 (BRENNAN, J., concurring in judgment) (LMRDA "explicitly provides that it shall not displace such legislation of the States").[11] In affirmatively preserving the operation of state laws, § 603(a) indicates that Congress necessarily intended to preserve *some* room for state action concerning the responsibilities and qualifications of union officials. Moreover, § 504 itself makes clear that Congress did not seek to impose a uniform federal standard on those who may serve as union officials. An individual is disqualified from holding office for five years under § 504 only if he has been convicted of certain state law crimes. His eligibility for union office may be restored earlier depending on the various state laws providing for the restoration of citizen rights to convicted felons. See 104 Cong. Rec. 10991–10994 (1958) (remarks of Sen. McNamara). Thus, the federal law's disqualification criteria themselves are premised on state laws which of course vary throughout the Nation. Finally, our conclusion that Congress might not view such state regulation as necessarily interfering with national labor policy is buttressed by consideration of the concerns that led Congress to enact LMRDA in the first place. Congress was prompted to take action in large part because the governmental machinery was not "effective in policing specific abuses at the local level" and in "stamp[ing] out crime and corruption [in

---

cept as explicitly provided to the contrary, nothing in this chapter shall take away any right or bar any remedy to which members of a labor organization are entitled under such other Federal law or law of any State." See also 29 U. S. C. § 524 (separate "saving clause" which explicitly preserves state authority to enforce general criminal laws).

[11] It was upon the authority of *De Veau* that the District Court in the instant cases rejected appellees' argument that § 93 of the Act was directly pre-empted by LMRDA. See 536 F. Supp., at 326–328. Appellees no longer press this contention.

unions]." S. Rep. No. 187, *supra*, at 6. Consistent with this overarching legislative purpose, we can more readily presume that Congress would allow a State to adopt different and more stringent qualification requirements for union officials to effectuate this important goal.

In *De Veau* v. *Braisted, supra,* this Court first squarely confronted the issue of post-*Hill* congressional intent in the context of a challenge to § 8 of the New York Waterfront Commission Act. The New York statute prohibited any labor organization representing waterfront employees from collecting dues if any of its officers or agents had been convicted of a felony and had not subsequently been pardoned or cleared by the parole board. The statute had been enacted in furtherance of an interstate compact betweeen New York and New Jersey, establishing a bistate commission intended to combat crime and corruption on the States' mutual waterfront. The compact had been expressly approved by Congress pursuant to Art. I, § 10, of the Federal Constitution. The argument urged upon the Court was that the New York statute was pre-empted by § 7 of the NLRA as conflicting with *Hill*'s guarantee of "complete freedom of choice in the selection of [waterfront employees'] representatives." 363 U. S., at 152. In an opinion for a four-Justice plurality, Justice Frankfurter rejected this pre-emption argument and upheld the challenged statute.

The plurality opinion began by noting that the NLRA "does not exclude every state policy that may in fact restrict the complete freedom of a group of employees to designate 'representatives of their own choosing.'" *Ibid.* The plurality reasoned:

> "It would misconceive the constitutional doctrine of preemption—of the exclusion because of federal regulation of what otherwise is conceded state power—to decide this case mechanically on an absolute concept of free choice of representatives on the part of employees, heed-

less of the light that Congress has shed for our guidance. The relevant question is whether we may fairly infer a congressional purpose incompatible with the very narrow and historically explained restrictions upon the choice of a bargaining representative embodied in § 8 of the New York Waterfront Commission Act. *Would Congress, with a lively regard for its own federal labor policy, find in this state enactment a true, real frustration, however dialetically plausible, of that policy?" Id.,* at 153 (emphasis added).

After thus framing the inquiry, the plurality concluded that the Court need not in fact "imaginatively summon" a hypothetical congressional response since, in light of Congress' express approval of the compact, federal pre-emption could not be found. *Ibid.*

*DeVeau's* direct relevance for these cases lies less in its approach to determining § 7's pre-emptive scope than in its focus on the indicia of congressional intent that can be garnered from Congress' approval of the compact. At congressional hearings, labor union officials testified against the compact's ratification on the specific ground that the New York statute conflicted with federal labor policy and that approval of the compact would therefore appear to sanction all such state restrictions. See 363 U. S., at 151 (citing to testimony of International Longshoremen's Association). In approving the compact over such objections, Congress apparently concluded that, at least where the States were confronted with the "public evils"[12] of "crime, corruption, and racketeering,"[13] more stringent state regulation of the qualifications of union officials was not incompatible with the national labor policy as embodied in § 7.[14]

---

[12] H. R. Rep. No. 998, 83d Cong., 1st Sess., 1 (1953).

[13] *Ibid.* See also S. Rep. No. 583, 83d Cong., 1st Sess., 1–2 (1953).

[14] In recommending approval of the compact, the House Judiciary Committee distinguished between state laws directed specifically at labor-

In short, given Congress' intent as expressed in its enactment of LMRDA and its approval of the bistate compact at issue in *De Veau*, it can no longer be maintained that § 7 necessarily and obviously conflicts with every state regulation that may restrict the right of employees to select certain individuals to serve as the officials of their bargaining representatives. Nor can we find that New Jersey's imposition of its disqualification criteria in any way "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U. S., at 67. In its enactment of LMRDA and its awareness of New York's comparable restrictions when approving the bistate compact, Congress has at least indicated both that employees do not have an unqualified right to choose their union officials and that certain state disqualification requirements are compatible with § 7. This is particularly true in the case of New Jersey's disqualification criteria, the purpose of which is identical to that which motivated those New York restrictions implicitly approved by Congress: Both statutes form part of comprehensive programs designed to "vindicate a legitimate and compelling state interest, namely, the interest in combatting local crime infesting a particular industry." *DeVeau* v. *Braisted*, *supra*, at 155. In the absence of a more specific congressional intent to the contrary, we therefore conclude that New Jersey's regulation of the qualifications of casino industry union officials does not actually conflict with § 7 and so is not pre-empted by the NLRA.

We emphasize that this conclusion does not implicate the employees' express § 7 right to select a particular labor union as their collective-bargaining representative, but only their subsidiary right to select the officials of that union organization. While the Court in *Hill* v. *Florida ex rel. Watson*,

management relations and those state laws directed at entirely separate problems: "The compact to which the committee here recommends that Congress grant its consent is in no sense antilabor legislation, but rather, antiracketeering legislation." H. R. Rep. No. 998, *supra*, at 6.

apparently assumed that the two rights were undifferentiated and equally protected, our reading of subsequent legislative action indicates that Congress has since distinguished between the two and has accorded less than absolute protection to the employees' right to choose their union officials. In this litigation, the casino industry employees' freedom in the first instance to select Local 54 to represent them in collective bargaining is simply not affected by the qualification criteria of New Jersey's Act.

## IV

Although the NLRA does not preclude § 93(b)'s imposition of qualification standards on casino industry union officials,[15] also at issue is the separate validity of that provision's dues collection ban imposed by the Commission to effect the removal of these disqualified persons from their union positions. As in *Hill* v. *Florida ex rel. Watson,* a sanction for noncompliance with an otherwise valid state regulation must, for pre-emption purposes, be assessed independently in terms of its potential conflict with the federal enactment. The Court in *Hill* concluded that Florida's filing requirement, while itself unobjectionable, could not be enforced by an injunction against the union's "functioning as a labor union" without contravening the NLRA. See 325 U. S., at 543. Appellees vigorously contend that imposition of the § 93(b)'s dues collection sanction will similarly prohibit Local 54 from functioning

---

[15] We note that there is apparently no challenge to § 93(a)'s separate requirement that each labor organization seeking to represent casino hotel employees must register with the Commission annually, and must disclose the names of its officers, agents, affiliated organizations, and pension and welfare funds. Appellees have not shown that this requirement of registration imposes any burden on them. Indeed, they effectively concede that this § 93(a) requirement standing alone presents no conflict with federal law on the authority of *Hill* v. *Florida ex rel. Watson.* See 325 U. S., at 543 (finding that the filing requirement "in and of itself" does not conflict with the NLRA). See Brief for Appellees 20–21.

as the employees' bargaining representative, thereby directly abridging the employees' separate § 7 rights to organize and bargain collectively.  According to affidavits submitted in the District Court, 85% of Local 54's monthly income comes from membership dues paid by casino hotel employees.  Without these payments, Local 54 claims that it could no longer process employee grievances, administer collective-bargaining agreements, bargain for new agreements, organize the unorganized, or perform the other responsibilities of a collective-bargaining agent.  See Brief for Appellees 23–24, and n. 11.

Unfortunately, because of the procedural posture of this litigation, we cannot decide this issue.  Appellees' factual allegations were never addressed by the District Court and the Court of Appeals.  We are thus confronted with a situation comparable to that presented in *Alabama State Federation of Labor* v. *McAdory*, 325 U. S. 450 (1945), in which the Court declined to decide whether the NLRA pre-empted a state filing requirement for unions because the statute had not been "construed to operate . . . by its penal sanctions . . . to prevent [the unions] . . . from functioning within the state for non-compliance . . ." *Id.*, at 466.  We follow the same course here, and remand so that the District Court can make the requisite findings of fact to determine whether imposition of the dues collection ban will so incapacitate Local 54 as to prevent it from performing its functions as the employees' chosen collective-bargaining agent.

We observe that even a finding that § 7 prohibits imposition of the dues collection sanction need not imply that New Jersey's disqualification standards are not otherwise enforceable by the Commission.  The Act, for example, apparently grants broad powers to the Commission to impose sanctions directly on disqualified persons and to limit or restrict a labor organization's registration.  See N. J. Stat. Ann. § 5:12–64 (West Supp. 1983–1984).  The Act also provides that the Commission "may exercise any proper power or authority

necessary to perform the duties assigned to it by law," and that "no specific enumeration of powers in this act shall be read to limit the authority of the commission to administer this act." § 5:12–75. The Commission itself has implicitly construed the Act as granting it the statutory authority to fashion different and less severe sanctions than those expressly enumerated in § 93(b). See App. to Juris. Statements 206a; 536 F. Supp., at 330. If the Commission has correctly interpreted state law, an issue we of course do not decide, it could then enforce § 93(b)'s disqualification criteria by numerous other means.

Finally, we also decline to reach the validity of § 93(b)'s second sanction—prohibition of a union's administration of its pension or welfare funds—despite the Court of Appeals' unanimous holding that the sanction is expressly pre-empted by § 514(a) of ERISA, 29 U. S. C. § 1144(a). In its supplemental decision, the Commission asserted its general authority to impose this sanction on Local 54, but, exercising its broad discretion, chose not to do so at that time. That decision rested both on the Commission's assumption that the dues collection sanction alone would suffice to ensure Local 54's compliance with the disqualification order and on its determination that it lacked adequate information as to whether Local 54 in fact administers pension and welfare funds within the meaning of § 93(b) as well as to the manner in which such a prohibition might impact the membership. See App. to Juris. Statements 214a; *supra,* at 499. Because the Commission never imposed this sanction on Local 54, we are presented with no concrete application of state law. The issue is hence not ripe for review, and the Court of Appeals' holding that the federal ERISA pre-empts this sanction must therefore be vacated. See, *e. g., Longshoremen* v. *Boyd,* 347 U. S. 222, 224 (1954).

## V

We find that § 93 of New Jersey's Act is not pre-empted by § 7 of the NLRA to the extent that it imposes certain limi-

tations on whom casino industry employees may choose to serve as officials of their bargaining representatives. On remand, the District Court should determine whether imposition of § 93(b)'s sanction of prohibiting the collection of dues from casino industry employees will effectively prevent the union from performing its statutory functions as bargaining representative for its members. The judgment of the Court of Appeals is therefore vacated, and the cases are remanded to the Court of Appeals with instructions to remand to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN and JUSTICE MARSHALL took no part in the decision of these cases.

JUSTICE WHITE, with whom JUSTICE POWELL and JUSTICE STEVENS join, dissenting.

Section 93(b) of the New Jersey Casino Control Act restricts the activities of unions representing workers employed in the casino industry. In particular, it provides that a union may not collect dues from casino workers or administer pension or welfare funds if any of its officials is disqualified under the criteria set forth in § 86. The Court purports to save some portion of this statute[1] by holding that a state law restricting the class of individuals who can serve as officers in a union is not pre-empted by federal labor law. If § 93(b) did no more than that, I would agree with the Court's

---

[1] It is not clear what portion of the statute the Court upholds since it expressly refuses to decide whether the dues prohibition and fund administration provisions are valid. Section 93(b) does nothing more than impose those two restrictions on unions whose officials are disqualified under the criteria set forth in § 86. It does not, by its terms, provide a mechanism for disqualifying any union officer. Therefore, while it appears that the Court holds that a State is free to disqualify certain individuals from acting as union officials as long as it does not impose sanctions on the union itself, it is not clear that anything in § 93(b) enables the State to do that.

resolution of these cases because, as the Court amply demonstrates, Congress' actions in enacting the LMRDA indicate that federal labor law does not pre-empt state laws which prevent certain types of individuals from serving as union officials.[2]  However, § 93(b) is not directed at the individuals who are disqualified under § 86.  It imposes sanctions on the union itself and, in so doing, infringes on the employees' federally protected rights.

Section 7 of the NLRA grants covered employees the right "to bargain collectively through representatives of their own choosing."  29 U. S. C. § 157.[3]  A bargaining representative achieves this status by being "designated or selected for the purposes of collective bargaining by the majority of the em-

---

[2] If these cases required us to determine whether New Jersey could enforce the limits in § 86 by imposing sanctions directly against the disqualified individual, for example by imposing fines or criminal penalties on those who hold union office after being disqualified, I would hold that it could. Section 93(b) does not purport to do that, however, and it is that statute which we are asked to review.

[3] The Court correctly recognizes that there is a fundamental difference between the employees' absolute § 7 right to choose which labor organization will act as their bargaining representative and their less absolute right to determine who will serve as officers in that organization.  One need only examine the actual workings of most unions in order to realize that the two rights are not coextensive.  For example, while a nonunion employee in an agency shop retains his § 7 right to participate in the selection of the bargaining representative, he often has no say in who will serve as officers of the union that represents him in the bargaining process since such decisions are generally made by union members only.  Similarly, while only the members of a particular collective-bargaining unit are empowered to decide which union will act as their bargaining representative, all members of the union, even those not in the particular bargaining unit, are generally free to participate in the process of electing union officials.  Thus, in a large union, it is possible that a substantial majority of the members of a particular bargaining unit may vote against the union official who is eventually elected.  Even though the members of the bargaining unit are unable to select the union official of their choice in such situations, there would be no legitimate claim that this somehow interfered with their § 7 right to bargain through the representative of their choice.

ployees in a unit appropriate for such purposes." 29 U. S. C. § 159(a). The employees' right to exercise this right is protected from employer, 29 U. S. C. § 158(a)(1), labor organization, 29 U. S. C. § 158(b)(1), and state, *Hill* v. *Florida ex rel. Watson*, 325 U. S. 538 (1945), interference. The employees whose rights are involved in these cases have exercised this right by selecting Local 54 as their bargaining representative.[4] The State, acting pursuant to § 93(b), has sought to prohibit Local 54 from collecting dues from these employees, thereby effectively preventing the union from carrying out the collective-bargaining function and nullifying the employees' exercise of their § 7 right.

In *Hill* v. *Florida ex rel. Watson*, the Court held that federal labor policy prohibits a State from enforcing permissible regulations by the use of sanctions that prevent the union "from functioning as a labor union." *Id.*, at 543. Allowing the State to so restrict the union's conduct infringes on the employees' right to bargain collectively through the representative of their own choosing because it prevents that representative from functioning as a collective-bargaining agent. The same effect would occur if New Jersey were to enjoin Local 54 from collecting dues from employees in the casino industry. A union which cannot sustain itself financially obviously cannot effectively engage in collective-bargaining activities on behalf of its members. Unlike the Court, I see no need to remand these cases in order to determine whether, as a factual matter, Local 54 is so dependent on dues that it will be prevented from effectively functioning as a bargaining representative if that source of revenue is cut off. I am willing to hold that, as a matter of law, a statute

---

[4] Under the NLRA, an individual, as well as a labor organization, can serve as the exclusive bargaining representative. 29 U. S. C. § 152(4). See *Louisville Sanitary Wiper Co.*, 65 N. L. R. B. 88 (1945); *Robinson-Ransbottom Pottery Co.*, 27 N. L. R. B. 1093 (1940). The employees whose interests are at stake in these cases have chosen a union (Local 54), rather than an individual, as their bargaining representative.

like § 93(b), which prohibits a union from collecting dues from its members, impairs the union's ability to represent those members to such an extent that it infringes on their § 7 right to bargain through the representative of their choice. Since the Court refuses to strike down the statute on this ground, I respectfully dissent.