628 F.Supp. 1537 (1986)
The INSURANCE BOARD UNDER the SOCIAL INSURANCE PLAN OF BETHLEHEM STEEL CORPORATION AND SUBSIDIARY COMPANIES, and Pennsylvania Blue Shield, Plaintiffs,
v.
William MUIR, Acting Insurance Commissioner of the Commonwealth of Pennsylvania, Defendant.
Civ. A. No. 85-0930.
United States District Court, M.D. Pennsylvania.
February 28, 1986.
Thomas E. Wood, Keefer, Wood, Allen & Rahal, Harrisburg, Pa., Elaine L. Mead, Camp Hill, Pa., Kathleen M. Mills, Bethlehem, Pa., Douglas D. Connah, Jr., Barbara E. Schlaff, Elizabeth C. Honeywell, Venable, Baetjer & Howard, Baltimore, Md., *1538 Gary R. Truitt, Pittsburgh, Pa., for plaintiffs.
Ellis M. Saull, Deputy Atty. Gen., Harrisburg, Pa., for defendant.

MEMORANDUM
CALDWELL, District Judge.

I. Introduction.

Plaintiffs, The Insurance Board under the Social Insurance Plan of Bethlehem Steel Corporation and Subsidiary Companies (Board), Pennsylvania Blue Shield (Blue Shield) and Blue Cross of Western Pennsylvania (Blue Cross) have moved for summary judgment in this declaratory judgment action.[1] They contend that the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq. has preempted the defendant, Insurance Commissioner of the Commonwealth of Pennsylvania,[2] from enforcing certain state mandated-benefit laws in connection with an employee health care plan regulated under ERISA. Defendant opposes the motion.
The issue presented is whether contractual agreements between the Board and Blue Shield and Blue Cross (collectively sometimes referred to as the "Blues") deal with the business of insurance so that the plan can be indirectly regulated by the Commonwealth even though the plan itself is subject to the provisions of ERISA.

II. Background.

From the affidavits and pleadings filed by the contestants, the following is the background of this litigation.[3] The Board is alleged to have overall responsibility for administering the Social Insurance Plan of Bethlehem Steel Corporation and Subsidiary Companies (Plan). Several health and welfare programs are provided by the Plan. The three programs at issue in the instant case are: (1) the Comprehensive Medical Program for the benefit of certain employees and pensioners; (2) the Program of Insurance Benefits for Hourly Paid Employees; and (3) the Program of Hospital and Medical/Surgical Benefits for Eligible Pensioners and Surviving Spouses. (Affidavits of Charles F. Collins, Plan Administrator). The Board's contracts with the Blues confers responsibility on the Blues to handle participants' claims under these programs. This litigation was triggered by a letter received by Blue Shield from the Department of Insurance, dated June 6, 1985, expressing the Department's view of the deficiencies in the hourly paid employee program in light of certain requirements of Pennsylvania insurance law.[4]
Plan participants receive Blue Shield and Blue Cross cards.[5] To use Blue Shield as an example, when participants have a claim they submit it to Blue Shield on Blue Shield benefits and claims forms. Blue Shield then uses its own staff and office procedures to process plan participant claims. It makes the initial determination as to coverage under the Plan.
Blue Shield pays participants' claims directly. The Board is obligated to make monthly payments to Blue Shield to cover anticipated claims. The amount owed is based upon the amount of claims paid in the second preceding month before the month in which the money is due. Payment must be made by the first of the month for claims submitted during that *1539 month. If Blue Shield does not receive payment by the fifth, it will no longer process or pay claims. It also is no longer obligated on claims not processed and paid by it when the Board has ceased to make its monthly payment.
The Board's payment also includes certain administrative fees, $3.20 per participant per month for hourly paid employees and $2.05 per participant per month for eligible pensioners. These fees are due by the twentieth of the month preceding the month for which the payment is due.
At the end of a contract term, Blue Shield prepares a settlement. If the amount of claims paid plus administrative fees exceeds the payments made by the Board, the Board must pay the difference to Blue Shield within thirty days of being notified of the deficiency. If the payments exceed the claims paid plus administrative fees, Blue Shield must remit the excess to the Board. The same conditions apply if the contract is terminated in mid-term. Blue Cross has a similar arrangement with the Board for programs it administers.

III. Discussion.

A. Abstention.

Defendant renews the contention made in his motion to dismiss that this court should abstain from this controversy because there is an on-going administrative proceeding being conducted by the Department of Insurance. It is argued that plaintiffs should be required to present their claims in that forum out of respect for federal-state comity. We rejected this assertion in disposing of the motion to dismiss, concluding that abstention was inappropriate when plaintiffs' position was that the state cannot regulate ERISA plans at all. See Hotel and Restaurant Employees and Bartenders International Union Local 54 v. Danziger, 709 F.2d 815 (3d Cir. 1983), vacated on other grounds, 468 U.S. 491, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984). We see no reason to reverse our earlier decision.

B. Plaintiffs' Motion for Summary Judgment.

Plaintiffs' motion will be assessed under the following well established standard:
Summary judgment under Federal Rule of Civil Procedure 56 is appropriate only where the moving party establishes that no genuine issue exists as to any of the material facts in the case, and that he is entitled to judgment as a matter of law. See, e.g., Hollinger v. Wagner Mining Equipment Co., 667 F.2d 402, 405 (3d Cir.1981). Courts should resolve any doubts as to the existence of issues of material fact against the moving party, and view all inferences in the light most favorable to the nonmoving party. [citation omitted].
Fragale & Sons Beverage Co. v. Dill, 760 F.2d 469, 472 (3d Cir.1985) (brackets added).
In Metropolitan Life Insurance Co. v. Massachusetts, ___ U.S. ___, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985), the Supreme Court held that ERISA did not preempt the application of state mandated-benefit laws to insurance policies purchased by employee-health care plans regulated by ERISA. The plaintiff insurance companies had contended that Massachusetts could not require them to offer coverage for mental illness in policies purchased by ERISA plans. The federal law provided that ERISA:
shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan....
29 U.S.C. § 1144(a).
That same section also contained, however, a saving clause which provided that:
nothing in [ERISA] shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.
Id. at § 1144(b)(2) (brackets added).
This qualifying language was further modified by the so-called "deemer clause" which provides that no employee benefit plan, such as the one at issue in the instant case, "shall be deemed to be an insurance *1540 company or other insurer ... or to be engaged in the business of insurance ... for purposes of any law of any State purporting to regulate insurance companies, insurance contracts...." Id. at § 1144(b)(2)(B).
The Supreme Court concluded that these statutory provisions saved the state's authority to regulate insurance policies purchased to satisfy obligations under ERISA plans but that the plans themselves could not be regulated. Hence, the policies at issue in Metropolitan were not exempt from regulation by state insurance laws. The Court also observed that:
We are aware that our decision results in a distinction between insured and uninsured plans, leaving the former open to indirect regulation while the latter are not. By so doing we merely give life to a distinction created by Congress in the "deemer clause," a distinction Congress is aware of and one it has chosen not to alter.
___ U.S. at ___, 105 S.Ct. at 2393, 85 L.Ed.2d at 745. (footnote omitted).
Plaintiffs rely upon this quoted language in claiming that Pennsylvania is preempted from enforcing its mandated-benefits laws in connection with the plan since, in their view, the programs are self-insured, being funded by the employer. Further, they argue that the contracts with the Blues are not insurance policies. The Blues merely provide the Plan with administrative services in disposing of claims. Conversely, defendant contends that the contracts are in substance, if not in name, simply typical group insurance contracts issued by the Blues in the normal course of their business. Hence, Metropolitan permits the kind of indirect regulation of the plan attempted by Pennsylvania here.
The following criteria, developed in connection with the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq, which left the states free to regulate the "business of insurance" guide our disposition of plaintiffs' motion. The criteria are as follows: (1) whether the practice being considered has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and the insured; and, (3) whether the practice is limited to entitites within the insurance industry. Union Labor Life Insurance Co. v. Pireno, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982).
Relying solely upon the first criterion, plaintiffs argue that the contracts do not constitute insurance because no risk is transferred or spread to the Blues. The Board must pay in advance a monthly sum, based upon historical experience, which it is anticipated will cover the total amount of claims to be made during the month. If it fails to make the payment by the fifth of the month, Blue Cross and Blue Shield have no further obligation to pay any claims. Since all claims are ultimately paid by the Board, and the Blues have no obligation to pay claims when they have not been compensated by the Board, the risk of loss remains with the Board. Plaintiffs cite Group Life & Health Insurance Co. v. Royal Drug Co., 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), and SEC v. Variable Annuity Life Insurance Co., 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959), for the proposition that risk spreading or transfer is an indispensable part of a contract of insurance. It follows that their contracts are not insurance policies and cannot be regulated by Pennsylvania.
We believe plaintiffs' sole reliance upon the first criterion to demonstrate preemption is misplaced. As stated by the Court in Pireno, supra, "[n]one of these criteria is necessarily determinative in itself...." Id. 458 U.S. at 129, 102 S.Ct. at 3009, 73 L.Ed.2d at 656 (brackets added). For instance, in Metropolitan, the Court, in rejecting plaintiffs' contention that the Massachusetts law was preempted because it dealt with health and not insurance, examined the law under all three criteria.[6]
*1541 Although defendant has submitted an affidavit countering plaintiffs' claim that the contracts do not involve risk on the part of the Blues, we will not decide that issue. For we believe the remaining two criteria indicate that plaintiffs are not entitled to a judgment that preempts Pennsylvania from regulating the contractural relationship between the Blues and the Board.[7]
The second criterion is whether the practice is an integral part of the policy relationship between the insurer and the insured. It is difficult to apply this criterion directly to the circumstances of this case. In previous cases, there was no doubt that an insurer was involved in the disputed practice. Here, plaintiffs deny that the Blues are acting in that capacity. We conclude, however, that the Blues are doing so. Application of the second criterion thus becomes straightforward once that conclusion is reached.
Participants in the Plan are issued Blue Cross and Blue Shield cards. They must go to the Blues to file claims on standard Blue Cross and Blue Shield forms. The Board has no provider agreements. It relies upon providers under contract to the Blues to perform services for participants. The Board pays a monthly administrative fee based upon the number of participants in the Plan and advances to the Blues a monthly sum to cover anticipated claims that will be paid by the Blues in that month. At the end of each contract term the Blues are reimbursed for claims in excess of payments or refund payments in excess of claims. Administrative fees are taken into account in making this balance.
As argued by defendant, this would appear to be more than just an administrative arrangement. First, in defendant's view, a purely administrative contract is exemplified by Medicare's contract with Blue Shield. In that agreement, Medicare recipients receive medicare cards. Blue Shield, without any transfer of funds as in the instant case, pays Medicare claims directly with Medicare funds made available to Blue Shield by a letter of credit. Further, the administrative fee is based only upon the number of claims actually adjusted, not, as here, upon the number of participants. Moreover, Medicare has separate provider agreements.
Second, defendant points out that the Board's method of payment corresponds to a system of premium rating commonly used by the Blues called experience rating; specifically, cost plus premium rating. (Affidavit of Arthur J. Sconing, ¶ 3; Affidavit of J. Alan Laurer, ¶ 4). In the cost-plus method, speaking in the context of the typical Blue Shield group insurance policy:
there is a settlement at the end of each contract year. The actual premium income *1542 for the contract year is compared with incurred claims plus retention (retention is charges for administrative expenses, conversion charge and contingency reserves). If premium income is larger, the difference is paid by Blue Shield to the group. If claims plus retention is larger, the difference is paid by the group to Blue Shield. A group must have 500 or more contracts to be eligible for the cost-plus method.
(Laurer affidavit, ¶ 4).
In its totality, each contractural arrangement between the Board and the Blues creates a direct relationship between the Blues and the plan participants which is indistinguishable from insurer and policyholder. Simply put, the participants look to the Blues to approve, process, and pay their claims. Accordingly, Pennsylvania could certainly regulate this relationship since policy relationships are included in the business of insurance along with the policy's reliability, interpretation and enforcement. See Pireno, supra.
This substantial relationship is in sharp contrast to the arrangement at issue in Royal Drug, supra. There the Supreme Court held that contracts between Blue Shield and certain pharmacies for filling the prescriptions of Blue Shield subscribers were not the business of insurance and hence not exempt from anti-trust scrutiny. The Court noted, albeit in connection with the first criterion involving risk, that "policyholders are basically unconcerned with arrangements made between Blue Shield and participating pharmacies." Id. 440 U.S. at 214, 99 S.Ct. at 1074, 59 L.Ed.2d at 270 (footnote omitted). Here, of course, plan participants do have a basic concern with the contractural arrangements between the Board and the Blues. It forces them into a direct relationship with the Blues in connection with the very heart of their health and welfare coverage.
The third criterion is whether the practice is limited to entities within the insurance industry. In Royal Drug, this criterion was not satisfied because the contracts there were with pharmacies, "entities outside the insurance industry." Id. at 224, 99 S.Ct. at 1080, 59 L.Ed.2d at 276. Similarly, the court in Pireno did not grant an anti-trust exemption because the practice at issue in that case, use of peer review advisory committees to determine the eligibility of claims, involved chiropractors, persons also outside the insurance industry. In the instant case, the contractural agreements are with entities intimately involved in the insurance industry in Pennsylvania. Hence, the third criterion has been satisfied here.
Plaintiffs have cited Children's Hospital v. Whitcomb, 778 F.2d 239 (5th Cir.1985) and Kilmer v. Central Counties Bank, 623 F.Supp. 994 (W.D.Pa.1985) to support their contention that an ERISA plan cannot be subject to state regulation simply because the plan employs a separate administrator to process claims. In neither of these cases, however, was the contractural relationship between the administrator and the employer at issue.[8] The defendant does not argue that every agreement by a third party to process claims for an ERISA plan is subject to state regulation; only one that imitates insurance contracts. Plaintiffs' cases are therefore not dispositive.
Plaintiffs accept the factual accuracy of the defendant's affidavits. They have only contended that those facts are irrelevant to a disposition of their motion. For the reasons set forth above, we disagree with this conclusion. Accordingly, although defendant has not cross-moved for summary judgment, under these circumstances we believe it is appropriate to enter judgment for defendant. See Viger v. Commercial Insurance Co., 707 F.2d 769 (3d Cir.1983); Kellner v. Aetna Casualty and Surety Co., 605 F.Supp. 331 (M.D.Pa.1984).
We will issue an appropriate order.
NOTES
[1] Blue Cross was granted leave to intervene as a plaintiff.
[2] The suit was instituted against William Muir, Acting Commissioner. He has since been succeeded by George F. Grode, also an Acting Commissioner.
[3] Neither party filed a statement of material facts as required by local rule 401.4.
[4] The deficiencies related to coverage for newborn children, 40 P.S. §§ 771-74 (Purdon Supp. 1985), coverage for psychological testing services, id. at § 767-69, maternity coverage, id. at §§ 3001-03 and coverage for certain health care providers.
[5] The affidavits of the parties refer to the contractural provisions but no contract is appended to the complaint or any of the documents submitted to the court. This discussion relies upon the duties as set forth in the affidavits and Exhibit "B" to the complaint, the summary plan description for participants.
[6] The Court noted the similarity between the ERISA saving clause and the McCarran-Ferguson Act and concluded that it appeared that the saving clause was intended to preserve the McCarran-Ferguson Act authorization of state regulation of the business of insurance. Id. ___ U.S. at ___ n. 21, 105 S.Ct. at 2392 n. 21, 85 L.Ed.2d at 743 n. 21. Hence, it used the judicial criteria created to interpret that Act to analyze plaintiffs' preemption argument.
[7] In doing so, we reject defendant's argument which relies upon language from Metropolitan which is inapposite to the case at bar. In fact, to bolster its argument on all three criteria defendant relies upon the following language from Metropolitan in which the Court was discussing whether the Massachusetts law was a mandated-benefit law. Concluding that it was, the Court stated as follows:

Section 47B obviously regulates the spreading of risk: as we have indicated, it was intended to effectuate the legislative judgment that the risk of mental-health care should be shared.... It is also evident that mandated-benefit laws directly regulate an integral part of the relationship between the insurer and the policyholder by limiting the type of insurance that an insurer may sell to the policyholder. Finally, the third criterion is present here, for mandated-benefit statutes impose requirements only on insurers, with the intent of affecting the relationship between the insurer and the policyholder. Section 47B, then, is the very kind of regulation that this Court has identified as a law that relates to the regulation of the business of insurance as defined in the McCarran-Ferguson Act.
Id. ___ U.S. at ___, 105 S.Ct. at 2391, 85 L.Ed.2d at 742-43 (footnote omitted).
Of course, the issue here is not whether the Pennsylvania law is a mandated-benefit law. Plaintiffs concede that it is. The only issue is whether the contracts between the Blues and the Board are part of the business of insurance and hence saved for state regulation. Thus, we reject defendant's argument that the above quoted analysis is applicable here.
[8] Significantly, in Kilmer, the court noted that the employer, prior to the accident giving rise to the claim against the plan, had terminated its insurance coverage with Blue Cross and Blue Shield and had begun to rely upon its general assets to fund the plan. Id. at 995.