[This opinion has been published in *Ohio Official Reports* at 81 Ohio St.3d 346.]

J.A. CROSON COMPANY, APPELLEE, *v*. J.A. GUY, INC. ET AL., APPELLANTS.

[Cite as *J.A. Croson Co. v. J.A. Guy, Inc*., 1998-Ohio-621.]

*Labor and industry—Public works—Prevailing wage law—Section 7 of National Labor Relations Act preempts state regulation under Ohio Adm.Code 4101:9-4-07(B)(6) and R.C. 4115.01(D) to the extent those provisions could be construed to restrain or inhibit federally protected use of job targeting programs.*

Section 7 of the National Labor Relations Act preempts state regulation under Ohio Adm.Code 4101:9-4-07(B)(6) and R.C. 4115.10(D) to the extent that those provisions could be construed to restrain or inhibit the federally protected use of job targeting programs.

(Nos. 96-2578 and 97-14—Submitted January 13, 1998—Decided April 8, 1998.)

APPEAL from and CERTIFIED by the Court of Appeals for Pickaway County, No. 95-CA-10.

─────────────

{¶ 1} This action arises out of a claim by J.A. Croson Company ("J.A. Croson") that the successful bidder on two public improvement projects, J.A. Guy, Inc. ("J.A. Guy"), violated Ohio prevailing wage law by cooperating with the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local 189 ("Local 189") with respect to a "job targeting" program.

{¶ 2} J.A. Guy placed successful bids on two public improvement projects, one involving plumbing for a new jail in Pickaway County and the other, following completion of the jail project, involving construction of a water softening system for the jail. Before submitting its bid on the jail project, J.A. Guy made a request to Local 189 that the union "target" the jail project by permitting any successful

bidder on the project that was also a signatory to a collective bargaining agreement with Local 189 to participate in the Plumbers and Pipe Fitters Local 189 Industry Advancement Program ("Industry Advancement Program"). Local 189 agreed to target the jail project and informed union contractors bidding on the project that, under its Industry Advancement Program, it would pay the successful bidder a $9 grant per man-hour worked by Local 189 members on the project. J.A. Guy calculated its bid accordingly and submitted the lowest bid on the jail project.

{¶ 3} Following completion of the jail project, it became necessary to install a water softening system. J.A. Guy bid on and received the construction contract for the water softening project. Local 189 did not target the water softening project and, consequently, did not pay J.A. Guy any funds under its Industry Advancement Program for the project.

{¶ 4} Pursuant to R.C. 4115.16(B), J.A. Croson, an unsuccessful bidder on both the jail project and the water softening project, filed a complaint in common pleas court alleging that J.A. Guy had violated Ohio's prevailing wage law. Specifically, the complaint alleged that J.A. Guy made a "special assessment" prohibited by Ohio Adm.Code 4101:9-4-07(B)(6) when it withheld two percent of employee gross earnings on both the jail and water softening projects for placement in the Industry Advancement Program Fund under the dues checkoff clause of its collective bargaining agreement with Local 189. Additionally, as the issues developed, J.A. Croson argued that J.A. Guy had violated the antikickback provision of Ohio's prevailing wage law (R.C. 4115.10[D]) by receiving job targeting grants from the union.

{¶ 5} J.A. Guy made Local 189 a third-party defendant to the action, asserting that all employee wage deductions under the collective bargaining agreement were remitted to Local 189 and, therefore, any use of those sums in violation of the prevailing wage law was caused by the union's acts or omissions.

J.A. Guy, Local 189, and J.A. Croson all moved for summary judgment on the basis of their respective claims and defenses.

{¶ 6} The trial court concluded that, pursuant to *San Diego Bldg. Trades Council v. Garmon* (1959), 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775, federal law preempted J.A. Croson's state claims and granted summary judgment in favor of J.A. Guy and Local 189. On appeal, the Pickaway County Court of Appeals reversed the trial court decision, holding federal preemption inapplicable.

{¶ 7} The Pickaway County Court of Appeals certified to this court a conflict between its judgment and the judgments of the Hamilton and Madison County Courts of Appeals in *Indep. Electrical Contrs. of Greater Cincinnati, Inc. v. Hamilton Cty. Div. of Pub. Works* (1995), 101 Ohio App.3d 580, 656 N.E.2d 18, and *J.A. Croson Co. v. Cent. Ohio Joint Vocational School Dist.* (1995), 104 Ohio App.3d 146, 661 N.E.2d 250. Upon consideration of the certified issue and contemporaneous discretionary appeals filed by J.A. Guy and Local 189, we determined that a conflict exists, accepted the discretionary appeals, and directed the parties to brief the following issue:

"Whether federal labor law preempts a claim that a union employer's deduction of union dues for a union 'Industry Advancement' or 'job targeting' fund violates Ohio's Prevailing Wage Law, R.C. 4115.01 *et seq.*, and state regulations adopted thereunder."

{¶ 8} The cause is now before this court for consideration of the discretionary appeals and resolution of the certified conflict.

––––––––––––––––––

*Kegler, Brown, Hill & Ritter, Ronald L. Mason* and *Thomas M.L. Metzger*, for appellee.

*Schottenstein, Zox & Dunn, Felix C. Wade* and *Edwin L. Skeens*, for appellant J.A. Guy, Inc.

*Benesch, Friedlander, Coplan & Aronoff, L.L.P., N. Victor Goodman, Mark D. Tucker* and *Rex A. Littrell*, for appellant Local 189.

*Betty D. Montgomery,* Attorney General, *Michael D. Allen* and *Daniel P. Jones*, Assistant Attorneys General, urging affirmance for *amicus curiae*, Ohio Bureau of Employment Services.

*Venable, Baetjer, Howard & Civiletti, L.L.P., Maurice Baskin* and *Paul A. Debolt*, urging affirmance for *amicus curiae*, Associated Builders and Contractors, Inc.

*Sherman, Dunn, Cohen, Leifer & Yellig, P.C., Terry R. Yellig* and *Jonathan D. Newman,* urging reversal for *amicus curiae,* the Building and Construction Trades Department, AFL-CIO, and the Ohio State Building and Construction Trades Council, AFL-CIO.

*Schmeltzer, Aptaker & Shepard, P.C., Robert L. Duston* and *Gary L. Lieber*, urging reversal for *amicus curiae,* National Electrical Contractors Association and National Electrical Contractors Association, Ohio Conference.

*Bricker & Eckler* and *Luther L. Liggett, Jr.,* urging reversal for *amicus curiae,* Ohio Mechanical Contracting Industry.

———————————

**COOK, J.**

## JOB TARGETING

{¶ 9} The legal dispute in this case centers on Local 189's use of a job targeting program. Job targeting is a strategy employed nationwide by construction unions, with the cooperation of unionized contractors, in response to declining union membership and the expanding market penetration of nonunion construction. See Northup & White, Subsidizing Contractors to Gain Employment; Construction Union "Job Targeting" (1996), 17 Berkeley J. Employment & Labor L. 62. The aim of job targeting programs is clear: unions want union contractors to bid successfully on construction projects so that the jobs created by those projects will

go to union members. Typically, unions carry out their job targeting programs by selecting projects to target and guaranteeing subsidies to union contractors that submit successful bids. The result is to lower union contractors' overall costs required to complete targeted projects, enabling union contractors to submit competitive bids.

{¶ 10} Local 189 carries on job targeting through its Industry Advancement Program. The union pays its grants to unionized contractors on targeted jobs from a fund specifically created for the program. The fund is maintained through union members' voluntary contributions, which are deducted from employee gross earnings at a rate of two percent and remitted to Local 189 pursuant to the dues checkoff clause of the union's collective bargaining agreements with its unionized contractors. The collective bargaining agreements label the two percent deduction as a "Market Recovery Assessment" and state that the assessment is additional to the 1 3/4 percent deduction for regular checkoff dues. The Market Recovery Assessment is subject to the periodic approval of union members.

{¶ 11} Accordingly, whether working on a targeted job or not, Local 189 union members have two percent of their gross earnings deducted and remitted to the union for placement in the Industry Advancement Program fund. The union chooses which jobs to target. A unionized contractor may request that the union target a particular job, but the ultimate decision of whether to target a job and how much to pay in grants is made by Local 189 officials.

OHIO'S PREVAILING WAGE LAW

{¶ 12} The prevailing wage statutes, R.C. 4115.03 through R.C. 4115.16, require contractors and subcontractors for public improvement projects to pay laborers and mechanics the so-called prevailing wage in the locality where the project is to be performed. "[T]he primary purpose of the prevailing wage law is to support the integrity of the collective bargaining process by preventing the undercutting of employee wages in the private construction sector." (Plurality

opinion.) *State ex rel. Evans v. Moore* (1982), 69 Ohio St.2d 88, 91, 23 O.O.3d 145, 147, 431 N.E.2d 311, 313.

{¶ 13} Two prevailing wage provisions are at issue. The first is Ohio Adm.Code 4101:9-4-07, a regulation that was adopted by the Administrator of the Bureau of Employment Services pursuant to R.C. 4115.12. Ohio Adm.Code 4101:9-4-07(B)(6) makes it a violation of R.C. 4115.07 to deduct union fines or special assessments from employee wages.[1] J.A. Croson seeks to demonstrate that the Market Recovery Assessment withheld by J.A. Guy from its employees' wages pursuant to its collective bargaining agreement with Local 189 is prohibited as a special assessment under the regulation. Also under J.A. Croson's theory, J.A. Guy's deduction of the Market Recovery Assessment reduces employee wages below the prevailing wage, constituting a violation of the prevailing wage law.

{¶ 14} The second provision at issue is R.C. 4115.10(D), which prohibits any person from demanding, requesting, or receiving any part of a worker's wages upon the statement, representation, or understanding that failure to comply with such demand or request will prevent the worker from procuring or retaining employment.[2] The statute contains an exception for any agent or representative of

---

1. Ohio Adm.Code 4101:9-4-07(B)(6) states:

"(B) The following deductions from wages may be made only if, prior to commencement of work by the employee on any project, employers procure and maintain, in writing, proof of voluntary deductions signed by the employee:

"* * *

"(6) Any deductions to pay regular union initiation fees and membership dues, not including fines or special assessments, provided that a collective bargaining agreement between the employer and representatives of its employees permits such deductions and such deductions are not otherwise prohibited by law."

2. R.C. 4115.10(D) provides:

"Where persons are employed and their rate of wages has been determined as provided in section 4115.04 of the Revised Code, no person, either for self or any other person, shall request, demand, or receive, either before or after the person is engaged, that the person so engaged pay back, return, donate, contribute, or give any part or all of the person's wages, salary, or thing of value, to any person, upon the statement, representation, or understanding that failure to comply with such request or demand will prevent the procuring or retaining of employment, and no person shall, directly or indirectly, aid, request, or authorize any other person to violate this section. This

a labor organization acting in the collection of dues or assessments of that organization. J.A. Croson seeks to demonstrate that J.A. Guy's receipt of job targeting funds violates R.C. 4115.10(D).

## PREEMPTION UNDER THE NLRA

{¶ 15} In any case concerning preemption, congressional purpose must be the ultimate focus. *Malone v. White Motor Corp.* (1978), 435 U.S. 497, 504, 98 S.Ct. 1185, 1189-1190, 55 L.Ed.2d 443, 450. The National Labor Relations Act ("NLRA") contains no express preemption provision. "Where the pre-emptive effect of federal enactments is not explicit, 'courts sustain a local regulation "unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States." ' " *Metro. Life Ins. Co. v. Massachusetts* (1985), 471 U.S. 724, 747-748, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728, 745, quoting *Allis-Chalmers Corp. v. Lueck* (1985), 471 U.S. 202, 209, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206, 213-214. In determining whether state regulation should yield to subordinating federal authority, the United States Supreme Court has been concerned with potential conflict regarding substantive law, remedies, and administration. The potential for conflict arises when two law-enforcing authorities, with the disharmonies inherent in two systems, one federal the other state, are required to apply inconsistent standards of substantive law and/or differing remedial schemes. *Garmon,* 359 U.S. at 241-242, 79 S.Ct. at 778, 3 L.Ed.2d at 781.

{¶ 16} The Supreme Court articulated two distinct NLRA preemption principles in *Metro. Life, supra.* "The first, '*Garmon* pre-emption,' see *San Diego Building Trades Council v. Garmon*, *supra*, forbids state and local regulation of activities that are 'protected by § 7 of the [NLRA], or constitute an unfair labor

_____

division does not apply to any agent or representative of a duly constituted labor organization acting in the collection of dues or assessments of such organization."

practice under § 8.' [*Garmon*] 359 U.S. at 244 [79 S.Ct. at 779, 3 L.Ed.2d at 782]. See also *Garner v. Teamsters*, 346 U.S. 485, 498-499 [74 S.Ct. 161, 170, 98 L.Ed. 228, 244] (1953) ('[W]hen two separate remedies are brought to bear on the same activity, a conflict is imminent').  *Garmon* pre-emption prohibits regulation even of activities that the NLRA only *arguably* protects or prohibits.  See *Wisconsin Dept. of Industry v. Gould Inc.*, 475 U.S. 282, 286 [106 S.Ct. 1057, 1061, 89 L.Ed.2d 223, 228] (1986).  This rule of pre-emption is designed to prevent conflict between, on the one hand, state and local regulation and, on the other, Congress' 'integrated scheme of regulation,' *Garmon*, 359 U.S., at 247 [79 S.Ct. at 781, 3 L.Ed.2d at 784], embodied in §§ 7 and 8 of the NLRA, which includes the choice of the NLRB, rather than state or federal courts, as the appropriate body to implement the Act." (Emphasis *sic*.)  *Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.* (1993), 507 U.S. 218, 224-225, 113 S.Ct. 1190, 1194-1195, 122 L.Ed.2d 565, 574, citing *Metro. Life*, 471 U.S. at 748-749, 195 S.Ct. at 2393-2394, 85 L.Ed.2d at 745-746, and fn. 26.

{¶ 17} "A second pre-emption principle, '*Machinists* pre-emption,' see *Machinists v. Wisconsin Employment Relations Comm'n* [1976], 427 U.S. [132] at 147 [96 S.Ct. 2548, 2556, 49 L.Ed.2d 396, 407] prohibits state and municipal regulation of areas that have been left ' "to be controlled by the free play of economic forces." '  *Id.*, at 140 [96 S.Ct. at 2553, 49 L.Ed.2d at 403] (citation omitted).  See also *Golden State Transit Corp. v. Los Angeles*, 475 U.S. 608, 614 [106 S.Ct. 1395, 1398, 89 L.Ed.2d 616, 623] (1986) (*Golden State I*);  *Golden State Transit Corp. v. Los Angeles*,  493 U.S. 103, 111 [110 S.Ct. 444, 451, 107 L.Ed.2d 420, 431] (1989) (*Golden State II*).  *Machinists* pre-emption preserves Congress' 'intentional balance " 'between the uncontrolled power of management and labor to further their respective interests.' " '  *Golden State I*, 475 U.S., at 614 [106 S.Ct. at 1399, 89 L.Ed.2d at 623-624] (citations omitted)." *Bldg. & Constr. Trade*

*Council of Metro. Dist.,* 507 U.S. at 225-226, 113 S.Ct. at 1195, 122 L.Ed.2d at 575.

## GARMON PREEMPTION

{¶ 18} "In *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 [79 S.Ct. 773, 3 L.Ed.2d 775], the Court made two statements which have come to be accepted as the general guidelines for deciphering the unexpressed intent of Congress regarding the permissible scope of state regulation of activity touching upon labor-management relations." *Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters* (1978), 436 U.S. 180, 187, 98 S.Ct. 1745, 1752, 56 L.Ed.2d 209, 219. The first statement relates to activity which is *clearly* protected or prohibited by the federal statute. The second articulated a more sweeping prophylactic rule concerning activity that is only *arguably* subject to the protections found in Section 7 or the prohibitions found in Section 8 of the NLRA. *Id.*

## CLEARLY PROTECTED OR CLEARLY PROHIBITED ACTIVITY

{¶ 19} "When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law. * * * Regardless of the mode adopted, to allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes." *Garmon,* 359 U.S. at 244, 79 S.Ct. at 779, 3 L.Ed.2d at 782-783.

{¶ 20} Accordingly, if the National Labor Relations Board ("NLRB") has decided, subject to appropriate federal judicial review, that conduct is either protected by Section 7 or prohibited by Section 8, the matter is at an end and states are ousted of all jurisdiction. *Id.* at 245, 79 S.Ct. at 780, 3 L.Ed.2d at 783.

ARGUABLY PROHIBITED OR PROTECTED ACTIVITY

**{¶ 21}** Where conduct only *arguably* falls under the protections of Section 7 or the prohibitions of Section 8 of the NLRA, and the NLRB has not yet passed on whether the conduct is actually protected or prohibited, and it may not be fairly assumed that the NLRB would adjudge the conduct to be neither protected nor prohibited, courts generally must refrain from adjudicating the issue. *Id.* at 244, 79 S.Ct. at 779, 3 L.Ed.2d at 783. "It is essential to the administration of the Act that these determinations be left in the first instance to the NLRB." *Id*. at 244-245, 79 S.Ct. at 779, 3 L.Ed.2d at 783. Accordingly, the Supreme Court has established the doctrine of primary jurisdiction to safeguard Congress's design to "entrust administration of the labor policy for the Nation to a centralized administrative agency [the NLRB]." *Gould,* 475 U.S. at 289-290, 106 S.Ct. at 1063, 89 L.Ed. at 230.

**{¶ 22}** In enacting the NLRA,

" 'Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes towards labor controversies. * * * A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law.' " *Garmon*, 359 U.S. at 242-243, 79 S.Ct. at 778, 3 L.Ed.2d at 781-782, quoting *Garner*, 346 U.S. at 490-491, 74 S.Ct. at 165-166, 98 L.Ed. at 239-240.

PROHIBITED CONDUCT VERSUS PROTECTED CONDUCT

{¶ 23} Regardless of whether conduct is clearly or only arguably subject to NLRA regulation, different concerns arise depending on whether the conduct may be said to be protected or prohibited. When conduct is prohibited, state regulation concerning the same issue may not necessarily come into direct conflict with the overt policy of the federal prohibition. Nevertheless, "the *Garmon* rule prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act. See [*Garmon*] 359 U.S., at 247 [79 S.Ct. at 780-781, 3 L.Ed.2d at 787]. The rule is designed to prevent 'conflict in its broadest sense' with the 'complex and interrelated federal scheme of law, remedy and administration,' *id.*, at 243 [79 S.Ct. at 778, 3 L.Ed.2d at 782] and [the Supreme] Court has recognized that '[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy.' " *Gould*, 475 U.S. at 286, 106 S.Ct. at 1061, 89 L.Ed.2d at 228, quoting *Amalgamated Assn. of Street, Elec. Ry. & Motor Coach Employees of Am. v. Lockridge* (1971), 403 U.S. 274, 287, 91 S.Ct. 1909, 1918, 29 L.Ed.2d 473, 483. With respect to activity prohibited under Section 8 of the NLRA, the court has carefully noted that " 'the range and nature of those remedies that are and are not available is a fundamental part' of the comprehensive system established by Congress." *Gould*, 475 U.S. at 287, 106 S.Ct. at 1061, 89 L.Ed.2d at 228, quoting *Lockridge*, 403 U.S. at 287, 91 S.Ct. at 1918, 29 L.Ed.2d at 483.

{¶ 24} "Apart from notions of 'primary jurisdiction,' there would be no objection to state courts' and the NLRB's exercising concurrent jurisdiction over conduct *prohibited* by the federal Act." (Emphasis added and footnote omitted.) *Sears,* 436 U.S. at 199-200, 98 S.Ct. at 1758-1759, 56 L.Ed.2d at 226-227. Considerations of federal supremacy, however, are implicated to a greater extent where conduct is *protected* under Section 7 of the NLRA. *Id.* Where conduct is

protected, "[t]he danger of permitting local adjudications is not that timing or form of relief might be different from what the Board would administer, but rather that the local court might restrain conduct that is in fact protected by the Act." *Sears,* 436 U.S. at 221, 98 S.Ct. at 1770, 56 L.Ed.2d at 240. (Brennan, J., dissenting.) The court has "frequently applied traditional pre-emption principles to find state law barred on the basis of an actual conflict with § 7. If employee conduct is protected under § 7, then state law which interferes with the exercise of these federally protected rights creates an actual conflict and is pre-empted by direct operation of the Supremacy Clause." *Brown v. Hotel & Restaurant Employees & Bartenders Internatl. Union Local 54* (1984), 468 U.S. 491, 501, 104 S.Ct. 3179, 3185, 82 L.Ed.2d 373, 383.

{¶ 25} Where state regulation would, in fact, inhibit federally protected activity, there is no need to invoke the primary-jurisdiction rationale set forth in *Garmon*. "The threshold question in every labor pre-emption case is whether the conduct with respect to which a State has sought to act is, or may fairly be regarded as, federally protected activity. Because conflict is the touchstone of pre-emption, such activity is obviously beyond the reach of all state power." *Garmon,* 359 U.S. at 250, 79 S.Ct. at 783, 3 L.Ed.2d at 786. (Harlan, J., concurring.) Accordingly, we must heed the court's caveat in *Brotherhood of RR. Trainmen v. Jacksonville Terminal Co.* (1969), 394 U.S. 369, 383, 89 S.Ct. 1109, 1118, 22 L.Ed.2d 344, 357, fn. 19, that "care must be taken to distinguish pre-emption based on federal protection of the conduct in question from that based predominantly on the primary jurisdiction of the National Labor Relations Board, although the two are often not easily separable." (Citations omitted.)

### THE NLRB HAS HELD THAT JOB TARGETING IS PROTECTED CONDUCT UNDER SECTION 7 OF THE NLRA

**{¶ 26}** In *Manno Elec., Inc.* (1996), 321 N.L.R.B. 278, 152 L.R.R.M. 1107, 1996 WL 276357, the NLRB adopted the following administrative law judge's ruling:

"Section 7 provides that employees shall have the right 'to engage in other concerted activities for the purpose of . . . other mutual aid and protection.' The objectives of the 'job targeting program' are to protect employee's jobs and wage scales. These objectives are protected by section 7." 321 N.L.R.B. at 298.

**{¶ 27}** This ruling elucidates the conflict between the NLRA and the Ohio regulations as J.A. Croson seeks to have them enforced. Whether characterized as an impermissible wage reduction or an illegal subsidy to union contractors, the prohibitions that J.A. Croson seeks to enforce under Ohio law cannot peacefully coexist with the board's classification of job targeting as "concerted activity" protected by Section 7 of the NLRA. Distilled to their elemental purpose, J.A. Croson's claims seek to invoke Ohio law to thwart Local 189's use of its job targeting program. Preemption analysis turns on the real effect of state policy on federal rights. *Livadas v. Bradshaw* (1994), 512 U.S. 107, 119, 114 S.Ct. 2068, 2076, 129 L.Ed.2d 93, 107. "Controlling and therefore superseding federal power cannot be curtailed by the State even though the ground of intervention be different than that on which federal supremacy has been exercised." *Weber v. Anheuser-Busch, Inc.* (1955), 348 U.S. 468, 480, 75 S.Ct. 480, 487-488, 99 L.Ed. 546, 557.

**{¶ 28}** Because the NLRB has held that job targeting is *actually* protected by the NLRA, there is no room for state regulation infringing that conduct. J.A. Croson's assertion that *Manno* is distinguishable because it did not involve a challenge brought under a state's prevailing wage law is not persuasive. See *Associated Builders & Contractors, Inc.* (July 1, 1997), 1997 NLRB LEXIS 535. Nothing in the *Manno* decision indicates that the NLRB would limit the NLRA's protection of job targeting to the facts of the case before it.

EXCEPTIONS TO THE GARMON DOCTRINE

SUPREME COURT OF OHIO

**{¶ 29}** The Supreme Court has refused "to apply the pre-emption doctrine to activity that otherwise would fall within the scope of *Garmon* if that activity 'was a merely peripheral concern of the [Act] [or] touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [courts] could not infer that Congress had deprived States of all power to act.' " *Farmer v. United Bhd. of Carpenters & Joiners of Am., Local 25* (1977), 430 U.S. 290, 296-297, 97 S.Ct. 1056, 1061, 51 L.Ed.2d 338, 348, quoting *Garmon*, 359 U.S. at 243-244, 79 S.Ct. at 779, 3 L.Ed.2d at 782.

**{¶ 30}** In *Farmer*, the court concluded that *Garmon* did not preempt the plaintiff's state court action against his union and its officials alleging intentional infliction of emotional distress, despite that the facts alleged, if true, would also constitute a Section 8 violation. *Id.* at 303, 97 S.Ct. at 1065, 51 L.Ed.2d at 352. The court emphasized, however, that in each case where it has recognized an exception to *Garmon* preemption, the conduct underlying the action pending in state court was not *protected* by the Act. *Id.* at 298-302, 97 S.Ct. at 1062-1064, 51 L.Ed.2d at 348-351. In *Sears*, *supra,* the court held that California state courts could properly entertain a cause of action against union members in trespass, despite the possibility that their picketing activity was protected by Section 7 of the NLRA. Prior to granting any relief for the trespass, however, the court noted the state court would have to decide that the trespass was not *actually* protected by federal law. *Id.*, 436 U.S. at 201, 98 S.Ct. at 1759, 56 L.Ed.2d at 227-228.

**{¶ 31}** Preemption exceptions based on local interests are, in fact, inapplicable where state regulation would restrain or inhibit activity that is actually protected by Section 7 of the NLRA. This distinction is necessary due to the differing rationales that underlie preemption based on actual federal protection of the conduct at issue and that which is based on the primary jurisdiction of the NLRB.

14

**{¶ 32}** "In the latter situation, a presumption of federal pre-emption applies even when the state law regulates conduct only arguably protected by federal law. Such a pre-emption rule avoids the potential for jurisdictional conflict between state courts or agencies and the NLRB by ensuring that primary responsibility for interpreting and applying this body of labor law remains with the NLRB. This presumption of federal pre-emption, based on the primary jurisdiction rationale, properly admits to exception when unusually 'deeply rooted' local interests are at stake. In such cases, appropriate consideration for the vitality of our federal system and for a rational allocation of functions belies any easy inference that Congress intended to deprive the States of their ability to retain jurisdiction over such matters. [The Supreme Court], therefore, [has] refrained from finding that the NLRA pre-empts state court jurisdiction over state breach of contract actions by strike replacements, state trespass actions, or state tort remedies for intentional infliction of emotional distress.

**{¶ 33}** "If the state law regulates conduct that is actually protected by federal law, however, pre-emption follows not as a matter of protecting primary jurisdiction, but as a matter of substantive right. Where, as here, the issue is one of an asserted substantive conflict with a federal enactment, then '[t]he relative importance to the State of its own law is not material ... for the Framers of our Constitution provided that the federal law must prevail.' *Free v. Bland* 369 U.S. 663, 666 [82 S.Ct. 1089, 1092, 8 L.Ed.2d 180, 183] (1962)." (Citations omitted.) *Brown,* 468 U.S. at 502-503, 104 S.Ct. at 3186, 82 L.Ed.2d at 384.

**{¶ 34}** Because job targeting is actually protected under Section 7 of the NLRA, the above exceptions are inapplicable. Accordingly, it is not important that J.A. Croson could not have presented the identical controversy to the NLRB. That inquiry is important only when it is the primary-jurisdiction rationale of *Garmon* that favors preemption. See *Sears,* 436 U.S. at 202, 98 S.Ct. at 1760, 56 L.Ed.2d at 228.

MACHINISTS PREEMPTION

{¶ 35} J.A. Croson and the court below rely heavily on the following Supreme Court reasoning as a basis to avoid preemption:

"The NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment, and not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions. The NLRA's declared purpose is to remedy '[t]he inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association.' § 1, 29 U.S.C. § 151. The same section notes the desirability of 'restoring equality of bargaining power,' among other ways, 'by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.'

"* * *

"It would further few of the purposes of the Act to allow unions and employers to bargain for terms of employment that state law forbids employers to establish unilaterally. 'Such a rule of law would delegate to unions and unionized employers the power to exempt themselves from whatever state labor standards they disfavored.' *Allis-Chalmers Corp. v. Lueck* [471 U.S.] at 212 [105 S.Ct. at 1911-1912, 85 L.Ed.2d at 216]. It would turn the policy that animated the Wagner Act on its head to understand it to have penalized workers who have chosen to join a union by preventing them from benefiting from state labor regulations imposing minimal standards on nonunion employers." (Citations omitted.) *Metro. Life,* 471 U.S. at 753-756, 105 S.Ct. at 2396-2397, 85 L.Ed.2d at 749-750.

16

{¶ 36} According to J.A. Croson, "Ohio's prevailing wage law simply does not prohibit or restrict employers and employees from engaging in collective bargaining or any other activity protected under the NLRA, but only speaks to certain outcomes of that negotiating process." Therefore, argues J.A. Croson, the law is not preempted. J.A. Croson characterizes Ohio's prevailing wage law as a minimum standard of employment and argues that it acts as a backdrop for negotiation, creating no interference with the negotiating *process.*

{¶ 37} The problem with J.A. Croson's analysis is that the above Supreme Court language is pertinent only with respect to *Machinists* preemption. As previously discussed, *Machinists* preemption does not pertain to conduct that is either arguably or clearly protected or prohibited under Section 7 or 8 of the NLRA. Instead, it involves a range of activity that is not expressly regulated under the NLRA, but that Congress has intentionally left to be controlled by the free play of economic forces.

{¶ 38} Collective bargaining is an area that Congress left largely to be controlled by the free play of economic forces. Nevertheless, the Supreme Court has held in cases such as *Metro. Life, supra,* and *Fort Halifax Packing Co., Inc. v. Coyne* (1987), 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1, that state laws establishing minimum wages and benefits, and presumably prevailing wage laws, generally do not conflict with the NLRA policy to promote equitable collective bargaining. These cases, however, do not extend to aspects of state regulation directly impinging on the federally protected right of union employees to engage in concerted activity. The concern here is not that state regulation will undermine the collective bargaining process; it is that state regulation will restrain union members from exercising a federally protected right. Accordingly, the cases upon which J.A. Croson relies that explore the nuances of *Machinists* preemption are of limited value to our inquiry.

CONCLUSION

**{¶ 39}** In light of the NLRB's holding in *Manno*, Section 7 of the NLRA preempts state regulation under Ohio Adm.Code 4101:9-4-07(B)(6) and R.C. 4115.10(D) to the extent that those provisions could be construed to restrain or inhibit the federally protected use of job targeting programs.[3]  Accordingly, we reverse the judgment of the appellate court.

*Judgment reversed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

---

3.  We reject the appellate court's conclusion that any conflict between the state and federal regulations can be avoided by requiring the employer to adjust gross wages so that, after deduction of the Market Recovery Assessment, union employees will still receive the prevailing wage.  Aside from the practical difficulties inherent in the suggestion, such a requirement would seriously hinder the effectiveness of job targeting programs and, in many instances, *disadvantage* union contractors in bidding on public improvement projects.  We need not look beyond this case to find an example.

Under the appellate court's theory, J.A. Guy would have been required to increase employee gross wages by two percent on the water softening system project to meet the prevailing wage law, despite the fact that J.A. Guy received no job targeting subsidies.  Accordingly, because of the Market Recovery Assessment, J.A. Guy would have started with a fixed labor cost two percent *above* the prevailing wage requirement.  This would have seriously hampered J.A. Guy in submitting a competitive bid.  The same scenario would be played out in the vast majority of public improvement projects where the union contractor is unable to secure job targeting funds.  Moreover, even where job targeting funds are available, the appellate court's suggestion would largely offset their intended benefit.