(Slip Opinion) OCTOBER TERM, 2011 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KURNS, EXECUTRIX OF THE ESTATE OF CORSON, DECEASED, ET AL. *v.* RAILROAD FRICTION PRODUCTS CORP. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 10–879.   Argued November 9, 2011—Decided February 29, 2012

George Corson worked as a welder and machinist for a railroad carrier. After retirement, Corson was diagnosed with mesothelioma. He and his wife, a petitioner here, sued respondents Railroad Friction Products Corporation and Viad Corp in state court, claiming injury from Corson's exposure to asbestos in locomotives and locomotive parts distributed by respondents. The Corsons alleged state-law claims of defective design and failure to warn of the dangers posed by asbestos. After Corson died, petitioner Kurns, executrix of his estate, was substituted as a party. Respondents removed the case to the Federal District Court, which granted them summary judgment, ruling that the state-law claims were pre-empted by the Locomotive Inspection Act (LIA), 49 U. S. C. §20701 *et seq.* The Third Circuit affirmed.

*Held:* Petitioners' state-law design-defect and failure-to-warn claims fall within the field of locomotive equipment regulation pre-empted by the LIA, as that field was defined in *Napier* v. *Atlantic Coast Line R. Co.,* 272 U. S. 605. Pp. 2–11.

(a) The LIA provides that a railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts or appurtenances are in proper condition and safe to operate without unnecessary danger of personal injury, have been inspected as required by the LIA and regulations prescribed thereunder by the Secretary of Transportation, and can withstand every test prescribed under the LIA by the Secretary. See §20701. Pp. 2–3.

(b) Congress may expressly pre-empt state law. But even without

an express pre-emption provision, state law must yield to a congressional Act to the extent of any conflict with a federal statute, see *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 372, or when the federal statute's scope indicates that Congress intended federal law to occupy a field exclusively, see *Freightliner Corp.* v. *Myrick*, 514 U. S. 280, 287. This case involves only the latter, so-called "field pre-emption." Pp. 3–4.

(c) In *Napier*, this Court held two state laws prescribing the use of locomotive equipment pre-empted by the LIA, concluding that the broad power conferred by the LIA on the Interstate Commerce Commission (the agency then vested with authority to carry out the LIA's requirements) was a "general one" that "extends to the design, the construction and the material of every part of the locomotive and tender and of all appurtenances." 272 U. S., at 611. The Court rejected the States' contention that the scope of the pre-empted field was to "be determined by the object sought through legislation, rather than the physical elements affected by it," *id.*, at 612, and found it dispositive that "[t]he federal and state statutes are directed to the same subject—the equipment of locomotives." *Ibid.* Pp. 4–5.

(d) The Federal Railroad Safety Act of 1970 (FRSA) did not alter the LIA's pre-emptive scope. By its terms, the FRSA—which instructs that "[t]he Secretary of Transportation . . . shall prescribe regulations and issue orders for every area of railroad safety supplementing laws and regulations in effect on October 16, 1970," 49 U. S. C. §20103(a)—does not alter pre-existing federal railroad safety statutes. Rather, it leaves those statutes intact and authorizes the Secretary to fill interstitial areas of railroad safety with supplemental regulation. Because the LIA was already in effect when the FRSA was enacted, the FRSA left the LIA, and its pre-emptive scope as defined by *Napier*, intact. P. 6.

(e) Petitioners do not argue that *Napier* should be overruled. Instead, petitioners contend that their claims fall outside the LIA's pre-empted field, as it was defined in *Napier*. Petitioners' arguments are unpersuasive. First, the argument that the pre-empted field does not extend to state-law claims arising from the repair or maintenance of locomotives is inconsistent with *Napier*'s holding that Congress, in enacting the LIA, "manifest[ed] the intention to occupy the entire field of regulating locomotive equipment." 272 U. S., at 611. Second, the argument that petitioners' failure-to-warn claims are not pre-empted because they do not base liability on the design or manufacture of a product ignores that a failure-to-warn claim alleges that the product itself is defective unless accompanied by sufficient warnings or instructions. Because petitioners' failure-to-warn claims are therefore directed at the equipment of locomo-

Syllabus

tives, they fall within the pre-empted field defined by *Napier*. Third, the argument that petitioners' claims are not pre-empted because manufacturers were not regulated under the LIA when Corson was exposed to asbestos is inconsistent with *Napier*, which defined the pre-empted field on the basis of the physical elements regulated, not on the basis of the entity directly subject to regulation. Finally, contrary to petitioners' argument, the LIA's pre-emptive scope is not limited to state legislation or regulation but extends to state common-law duties and standards of care directed to the subject of locomotive equipment. Pp. 6–11.

620 F. 3d 392, affirmed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, ALITO, and KAGAN, JJ., joined. KAGAN, J., filed a concurring opinion. SOTOMAYOR, J., filed an opinion concurring in part and dissenting in part, in which GINSBURG and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–879

GLORIA GAIL KURNS, EXECUTRIX OF THE ESTATE OF GEORGE M. CORSON, DECEASED, ET AL., PETITIONERS *v.* RAILROAD FRICTION PRODUCTS CORPORATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[February 29, 2012]

JUSTICE THOMAS delivered the opinion of the Court.

This case requires us to determine whether petitioners' state-law tort claims for defective design and failure to warn are pre-empted by the Locomotive Inspection Act (LIA), 49 U. S. C. §20701 *et seq.* The United States Court of Appeals for the Third Circuit determined that petitioners' claims fall within the field pre-empted by that Act, as that field was defined by this Court's decision in *Napier* v. *Atlantic Coast Line R. Co.,* 272 U. S. 605 (1926). We agree.

I

George Corson was employed as a welder and machinist by the Chicago, Milwaukee, St. Paul & Pacific Railroad from 1947 until 1974. Corson worked in locomotive repair and maintenance facilities, where his duties included installing brakeshoes on locomotives and stripping insulation from locomotive boilers. In 2005, Corson was diagnosed with malignant mesothelioma.

In 2007, Corson and his wife filed suit in Pennsylvania

state court against 59 defendants, including respondents Railroad Friction Products Corporation (RFPC) and Viad Corp (Viad). According to the complaint, RFPC distributed locomotive brakeshoes containing asbestos, and Viad was the successor-in-interest to a company that manufactured and sold locomotives and locomotive engine valves containing asbestos. Corson alleged that he handled this equipment and that he was injured by exposure to asbestos. The complaint asserted state-law claims that the equipment was defectively designed because it contained asbestos, and that respondents failed to warn of the dangers of asbestos or to provide instructions regarding its safe use. After the complaint was filed, Corson passed away, and the executrix of his estate, Gloria Kurns, was substituted as a party. Corson's widow and the executrix are petitioners here.

Respondents removed the case to the United States District Court for the Eastern District of Pennsylvania and moved for summary judgment. Respondents argued that petitioners' state-law claims were pre-empted by the LIA. The District Court agreed and granted summary judgment for respondents. See *Kurns* v. *A. W. Chesterton*, Civ. Action No. 08–2216 (ED Pa., Feb. 3, 2009), App. to Pet. for Cert. 39a. The Third Circuit affirmed. See *Kurns* v. *A. W. Chesterton, Inc.*, 620 F. 3d 392 (2010). We granted certiorari. 563 U. S. ___ (2011).

## II

Congress enacted the predecessor to the LIA, the Boiler Inspection Act (BIA), in 1911. The BIA made it unlawful to use a steam locomotive "unless the boiler of said locomotive and appurtenances thereof are in proper condition and safe to operate . . . without unnecessary peril to life or limb." Act of Feb. 17, 1911, ch. 103, §2, 36 Stat. 913–914. In 1915, Congress amended the BIA to apply to "the entire locomotive and tender and all parts and appurtenances

thereof."[1] Act of Mar. 4, 1915, ch. 169, §1, 38 Stat. 1192.
The BIA as amended became commonly known as the
Locomotive Inspection Act. As relevant here, the LIA
provides:

> "A railroad carrier may use or allow to be used
> a locomotive or tender on its railroad line only
> when the locomotive or tender and its parts and
> appurtenances—
> "(1) are in proper condition and safe to operate
> without unnecessary danger of personal injury;
> "(2) have been inspected as required under this
> chapter and regulations prescribed by the Secretary of
> Transportation under this chapter; and
> "(3) can withstand every test prescribed by the Sec-
> retary under this chapter." 49 U. S. C. §20701.[2]

The issue presented in this case is whether the LIA pre-
empts petitioners' state-law claims that respondents
defectively designed locomotive parts and failed to warn
Corson of dangers associated with those parts. In light of
this Court's prior decision in *Napier*, *supra*, we conclude
that petitioners' claims are pre-empted.

## III
### A

The Supremacy Clause provides that federal law "shall
be the supreme Law of the Land . . . any Thing in the
Constitution or Laws of any State to the Contrary not-
withstanding." U. S. Const., Art. VI, cl. 2. Pre-emption of

--------

[1] A "tender" is a "[a] car attached to a locomotive, for carrying a sup-
ply of fuel and water." Webster's New International Dictionary of the
English Language 2126 (1917).

[2] At the time of Corson's employment, this provision of the LIA was
worded somewhat differently. See 45 U. S. C. §23 (1946 ed.). Petition-
ers do not argue that the change in statutory language makes any
difference in this case.

state law thus occurs through the "direct operation of the Supremacy Clause." *Brown* v. *Hotel Employees*, 468 U. S. 491, 501 (1984). Congress may, of course, expressly pre-empt state law, but "[e]ven without an express provision for preemption, we have found that state law must yield to a congressional Act in at least two circumstances." *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 372 (2000). First, "state law is naturally preempted to the extent of any conflict with a federal statute." *Ibid.* Second, we have deemed state law pre-empted "when the scope of a [federal] statute indicates that Congress intended federal law to occupy a field exclusively." *Freightliner Corp.* v. *Myrick*, 514 U. S. 280, 287 (1995). We deal here only with the latter, so-called field pre-emption.

B

We do not, however, address the LIA's pre-emptive effect on a clean slate, because this Court addressed that issue 85 years ago in *Napier*. In that case, railroads challenged two state laws that "prohibit[ed] use within the State of locomotives not equipped with" certain prescribed devices, on the ground that the Interstate Commerce Commission (ICC), the agency then vested with the authority to carry out the LIA's requirements, had not required the devices in question.[3] 272 U. S., at 607, 609. In response, the States argued that their requirements were not pre-empted because they were directed at a different objective than the LIA. *Id.,* at 612. According to the States, their regulations were intended to protect railroad workers from sickness and disease, whereas "the federal regulation endeavors solely to prevent accidental injury in

———————

[3] Act of Feb. 17, 1911, §6, 36 Stat. 915. That authority has since been transferred to the Secretary of Transportation. Department of Transportation Act, §§6(e)(1)(E) and (F), 80 Stat. 939; see 49 U. S. C. §§20701–20702.

the operation of trains." *Ibid.*

To determine whether the state requirements were pre-empted, this Court asked whether the LIA "manifest[s] the intention to occupy the entire field of regulating loco-motive equipment[.]" *Id.,* at 611. The Court answered that question in the affirmative, stating that "[t]he broad scope of the authority conferred upon the [ICC]" by Con-gress in the LIA led to that conclusion. *Id.,* at 613. The power delegated to the ICC, the Court explained, was a "general one" that "extends to the design, the construction and the material of every part of the locomotive and ten-der and of all appurtenances." *Id.,* at 611.

The Court rejected the States' contention that the scope of the pre-empted field was to "be determined by the object sought through the legislation, rather than the physical elements affected by it." *Id.,* at 612. The Court found it dispositive that "[t]he federal and the state statutes are directed to the same subject—the equipment of locomo-tives." *Ibid.* Because the States' requirements operated upon the same physical elements as the LIA, the Court held that the state laws, "however commendable or how-ever different their purpose," *id.,* at 613, fell within the LIA's pre-empted field.

IV

Against the backdrop of *Napier*, petitioners advance two arguments in support of their position that their state-law claims related to the use of asbestos in locomotive equip-ment do not fall within the LIA's pre-empted field. Peti-tioners first contend that *Napier* no longer defines the scope of the LIA's pre-empted field because that field has been narrowed by a subsequently enacted federal statute. Alternatively, petitioners argue that their claims do not fall within the LIA's pre-empted field, even as that field was defined by *Napier*. We address each of petitioners' arguments in turn.

### A

First, petitioners suggest that the Federal Railroad Safety Act of 1970 (FRSA), 84 Stat. 971 (codified at 49 U. S. C. §20102 *et seq.*), altered the LIA's pre-emptive scope. The FRSA grants the Secretary of Transportation broad regulatory authority over railroad safety. See §20103(a). Petitioners point to the FRSA's pre-emption provision, which provides in part that "[a] State may adopt or continue in force a law, regulation, or order related to railroad safety . . . until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." §20106(a)(2) (2006 ed., Supp. III). According to petitioners, the FRSA's pre-emption provision supplanted the LIA's pre-emption of the field, with the result that petitioners' claims are not pre-empted because the Secretary has not issued a regulation or order addressing the use of asbestos in locomotives or locomotive parts.

Petitioners' reliance on the FRSA is misplaced. The FRSA instructs that "[t]he Secretary of Transportation, as necessary, shall prescribe regulations and issue orders for every area of railroad safety *supplementing laws and regulations in effect on October 16, 1970.*" §20103(a) (2006 ed.) (emphasis added). By its terms, the FRSA does not alter pre-existing federal statutes on railroad safety. "Rather, it leaves existing statutes intact, . . . and authorizes the Secretary to fill interstitial areas of railroad safety with supplemental regulation." *Marshall* v. *Burlington Northern, Inc.*, 720 F. 2d 1149, 1152–1153 (CA9 1983) (Kennedy, J.). Because the LIA was already in effect when the FRSA was enacted, we conclude that the FRSA left the LIA, and its pre-emptive scope as defined by *Napier*, intact.

### B

Since the LIA's pre-emptive scope remains unaltered,

petitioners must contend with *Napier*. Petitioners do not ask us to overrule *Napier* and thus do not seek to overcome the presumption of *stare decisis* that attaches to this 85-year-old precedent. See *Global-Tech Appliances, Inc.* v. *SEB S. A.*, 563 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 9) (noting the "special force of the doctrine of *stare decisis* with regard to questions of statutory interpretation" (internal quotation marks omitted)). Instead, petitioners advance several arguments aimed at demonstrating that their claims fall outside of the field pre-empted by the LIA, as it was defined in *Napier*. Each is unpersuasive.

1

Petitioners, along with the Solicitor General as *amicus curiae*, first argue that petitioners' claims do not fall within the LIA's pre-empted field because the claims arise out of the repair and maintenance of locomotives, rather than the use of locomotives on a railroad line. Specifically, they contend that the scope of the field pre-empted by the LIA is coextensive with the scope of the Federal Government's regulatory authority under the LIA, which, they argue, does not extend to the regulation of hazards arising from the repair or maintenance of locomotives. Therefore, the argument goes, state-law claims arising from repair or maintenance—as opposed to claims arising from use on the line—do not fall within the pre-empted field.

We reject this attempt to redefine the pre-empted field. In *Napier*, the Court held that Congress, in enacting the LIA, "manifest[ed] the intention to occupy the entire field of regulating locomotive equipment," and the Court did not distinguish between hazards arising from repair and maintenance as opposed to those arising from use on the line. 272 U. S., at 611. The pre-empted field as defined by *Napier* plainly encompasses the claims at issue here. Petitioners' common-law claims for defective design and failure to warn are aimed at the equipment of locomotives.

Because those claims "are directed to the same subject" as the LIA, *Napier* dictates that they fall within the pre-empted field. *Id.*, at 612.

2

Petitioners further argue that, even if their design-defect claims are pre-empted, their failure-to-warn claims do not suffer the same fate. In their complaint, petitioners alleged in closely related claims (1) that respondents negligently failed to warn of the risks associated with asbestos and to provide instructions concerning safe-guards for working with asbestos; and (2) that the asbestos-containing products were defective because respondents failed to give sufficient warnings or instructions con-cerning the "risks, dangers, and harm inherent in said asbestos products." See App. 20–27 (¶¶7–10, 12), 42 (¶8); see also Brief for Petitioners 11. According to petitioners, these claims do not fall within the LIA's pre-empted field because "[t]he basis of liability for failure to warn . . . is not the 'design' or 'manufacture' of a product," but is in-stead "the failure to provide adequate warnings regarding the product's risks." Reply Brief for Petitioners 16.

We disagree. A failure-to-warn claim alleges that the product itself is unlawfully dangerous unless accompanied by sufficient warnings or instructions. Restatement (Third) of Torts: Products Liability §2(c) (1997) (A failure-to-warn claim alleges that a product is defective "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distribu-tor, . . . and the omission of the instructions or warnings renders the product not reasonably safe"); see also *id.,* Comment *l*, at 33 ("Reasonable designs and instructions or warnings both play important roles in the production and distribution of reasonably safe products"). Thus, the "gravamen" of petitioners' failure-to-warn claims "is still

that [Corson] suffered harmful consequences as a result of his exposure to asbestos contained in locomotive parts and appurtenances." 620 F. 3d, at 398, n. 8. Because petitioners' failure-to-warn claims are therefore directed at the equipment of locomotives, they fall within the pre-empted field defined by *Napier*. 272 U. S., at 612.[4]

3

Petitioners also contend that their state-law claims against manufacturers of locomotives and locomotive parts fall outside of the LIA's pre-empted field because manufacturers were not regulated under the LIA at the time that Corson was allegedly exposed to asbestos. Petitioners point out that the LIA, as originally enacted in the BIA, subjected only common carriers to civil penalties. Act of Feb. 17, 1911, §9, 36 Stat. 916. It was not until 1988, well after the events of this case, that the LIA's penalty provision was revised to apply to "[a]ny person" violating the LIA. Rail Safety Improvement Act of 1988, §14(7)(A), 102 Stat. 633; see also §14(7)(B) (amending penalty provision to provide that "an act by an individual that causes a railroad to be in violation . . . shall be deemed a violation").

———————

[4]JUSTICE SOTOMAYOR apparently agrees that petitioners' failure-to-warn claims are directed at the equipment of locomotives. *Post,* at 5 (opinion concurring in part and dissenting in part). Yet, she argues, those claims affect locomotive equipment only "'tangentially.'" *Ibid.* (quoting *English* v. *General Elec. Co.*, 496 U. S. 72, 85 (1990)). Not so. A failure-to-warn claim imposes liability on a particular design of locomotive equipment unless warnings deemed sufficient under state law are given. This duty to warn and the accompanying threat of liability will inevitably influence a manufacturer's choice whether to use that particular design. By influencing design decisions in that manner, failure-to-warn liability has a "'direct and substantial effect'" on the "physical elements" of a locomotive. *Post,* at 5 (quoting *English, supra*, at 85).

This argument fails for the same reason as the two preceding arguments: It is inconsistent with *Napier*. *Napier* defined the field pre-empted by the LIA on the basis of the physical elements regulated—"the equipment of locomotives"—not on the basis of the entity directly subject to regulation. 272 U. S., at 612. Because petitioners' claims are directed at the equipment of locomotives, they fall within the pre-empted field.

Petitioners' proposed rule is also contrary to common sense. Under petitioners' approach, a State could not require *railroads* to equip their locomotives with parts meeting state-imposed specifications, but could require *manufacturers* of locomotive parts to produce only parts meeting those state-imposed specifications. We rejected a similar approach in an express pre-emption context in *Engine Mfrs. Assn.* v. *South Coast Air Quality Management Dist.*, 541 U. S. 246 (2004). There, a state entity argued that its rules prohibiting the purchase or lease of vehicles that failed to meet stringent emissions requirements were not pre-empted by the Clean Air Act, 42 U. S. C. §7543(a), because the rules in question were aimed at the purchase of vehicles, rather than their manufacture or sale. 541 U. S., at 248. We observed, however, that "treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense," because the "manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them." *Id.*, at 255. Similarly, a railroad's ability to equip its fleet of locomotives in compliance with federal standards is meaningless if manufacturers are not allowed to produce locomotives and locomotive parts that meet those standards. Petitioners' claims thus do not avoid pre-emption simply because they are aimed at the manufacturers of locomotives and locomotive parts.

4

Finally, petitioners contend that the LIA's pre-emptive scope does not extend to state common-law claims, as opposed to state legislation or regulation. Petitioners note that "a preempted field does not necessarily include state common law." Brief for Petitioners 38–39 (citing *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238 (1984); *Sprietsma* v. *Mercury Marine*, 537 U. S. 51 (2002)). *Napier*, however, held that the LIA "occup[ied] the entire field of regulating locomotive equipment" to the exclusion of state regulation. 272 U. S., at 611–612. That categorical conclusion admits of no exception for state common-law duties and standards of care. As we have recognized, state "regulation can be . . . effectively exerted through an award of damages," and "[t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 247 (1959). Cf. *Riegel* v. *Medtronic, Inc.*, 552 U. S. 312, 324 (2008) ("Absent other indication, reference to a State's 'requirements' [in a federal express pre-emption provision] includes its common-law duties"). We therefore conclude that state common-law duties and standards of care directed to the subject of locomotive equipment are pre-empted by the LIA.

\*  \*  \*

For the foregoing reasons, we hold that petitioners' state-law design-defect and failure-to-warn claims fall within the field of locomotive equipment regulation pre-empted by the LIA, as that field was defined in *Napier*. Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———

No. 10–879

———

GLORIA GAIL KURNS, EXECUTRIX OF THE ESTATE
OF GEORGE M. CORSON, DECEASED, ET AL.,
PETITIONERS *v.* RAILROAD FRICTION
PRODUCTS CORPORATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[February 29, 2012]

JUSTICE KAGAN, concurring.

Like JUSTICE SOTOMAYOR, *post,* at 1 (opinion concurring in part and dissenting in part), I doubt this Court would decide *Napier* v. *Atlantic Coast Line R. Co.*, 272 U. S. 605 (1926), in the same way today. The *Napier* Court concluded that Congress had "manifest[ed] the intention to occupy the entire field of regulating locomotive equipment," based on nothing more than a statute granting regulatory authority over that subject matter to a federal agency. *Id.,* at 611. Under our more recent cases, Congress must do much more to oust all of state law from a field. See, *e.g., New York State Dept. of Social Servs.* v. *Dublino*, 413 U. S. 405, 415 (1973) (rejecting preemption even though Congress had enacted a "detailed" and "comprehensive" regulatory scheme). Viewed through the lens of modern preemption law, *Napier* is an anachronism.

But *Napier* governs so long as Congress lets it—and that decision provides a straightforward way to determine whether state laws relating to locomotive equipment are preempted. According to *Napier*, the scope of the agency's power under the Locomotive Inspection Act (LIA) determines the boundaries of the preempted field. See 272 U. S., at 611 (state regulations were preempted because

they fell "within the scope of the authority delegated to the Commission"); see also *ante,* at 5 (the "'broad scope of the authority'" given to the agency "led to [*Napier*'s] conclusion"); *post,* at 7–8 ("[T]he pre-empted field is congruent with the regulated field"). And under that test, none of the state-law claims at issue here can survive.

All of us agree that the petitioners' defective-design claims are preempted. *Napier* recognized the federal agency's delegated authority over "the design, the construction and the material of every part of the locomotive." 272 U. S., at 611. In doing so, *Napier* did not distinguish between "hazards arising from repair and maintenance" of the parts and hazards stemming from their "use on the line." *Ante,* at 7. The agency thus has authority to regulate the design of locomotive equipment—like the asbestos-containing brakeshoes here—to prevent either danger. And that fact resolves the preemption question. Because the agency could have banned use of the brakeshoes as designed, the petitioners' defective-design claims—which would effectively accomplish the identical result—fall within the preempted field.

So too the petitioners' failure-to-warn claims, and for the same reason. *Napier* did not specifically address warnings, because the case in no way involved them. But if an agency has the power to prohibit the use of locomotive equipment, it also has the power to condition the use of that equipment on proper warnings. (And that is so, contrary to JUSTICE SOTOMAYOR's view, see *post*, at 8, n. 3, whether the warning is engraved into the part itself or posted on the workshop wall.) Here, for example, the agency need not have chosen between banning asbestos-containing brakeshoes and leaving them entirely unregulated. It could instead have required a warning about how to handle those brakeshoes safely. If, say, a mask would have protected a worker from risk, then the agency could have demanded a notice to that effect. See, *e.g., Law* v.

*General Motors Corp.*, 114 F. 3d 908, 911 (CA9 1997) ("As for warning requirements, these too are within the scope of the [agency's] authority"); *Scheiding* v. *General Motors Corp.*, 22 Cal. 4th 471, 484, 993 P. 2d 996, 1004 (2000) (same).* And because the agency could have required warnings about the equipment's use, the petitioners' failure-to-warn claims, no less than their defective-design claims, are preempted under *Napier*.

　　I understand these views to comport with the Court's opinion in this case, and I accordingly join it in full.

---

　　*JUSTICE SOTOMAYOR argues that "preserving petitioners' failure-to-warn claims coheres with the LIA's regulatory regime" because the agency disclaims authority over locomotive repair and maintenance. *Post,* at 7. But that claim conflates two separate distinctions. The agency draws a line not between mandating design changes and mandating warnings, but between regulating equipment that is hazardous to repair and regulating equipment that is hazardous to use on the railroad line. In keeping with that analysis, the agency contends that the petitioners' design-defect claims also fall outside the preempted field because the alleged defect in the brakeshoes rendered dangerous only their repair, and not their on-line use. See Brief for United States as *Amicus Curiae* 12–13. The agency's understanding of its authority therefore does not support JUSTICE SOTOMAYOR's position. As the agency agrees, the petitioners' claims must stand or fall together if viewed through the lens of the agency's regulatory authority. In my view, they fall because the Court rightly rejects the agency's proffered distinction between regulating the dangers of repairing equipment and regulating the dangers of using that equipment on line. See *supra,* at 2.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–879

_____

GLORIA GAIL KURNS, EXECUTRIX OF THE ESTATE
OF GEORGE M. CORSON, DECEASED, ET AL.,
PETITIONERS *v.* RAILROAD FRICTION
PRODUCTS CORPORATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[February 29, 2012]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG
and JUSTICE BREYER join, concurring in part and dissent-
ing in part.

I concur in the Court's holding that the Locomotive
Inspection Act (LIA), 49 U. S. C. §20701 *et seq.,* pre-empts
petitioners' tort claims for defective design, but I respect-
fully dissent from the Court's holding that the same is
true of petitioners' claims for failure to warn. In my view,
the latter escape pre-emption because they impose no
state-law requirements in the field reserved for federal
regulation: "the equipment of locomotives." *Napier* v.
*Atlantic Coast Line R. Co.*, 272 U. S. 605, 612 (1926).

I

Statutory *stare decisis* compels me to agree that the LIA
occupies "the field of regulating locomotive equipment
used on a highway of interstate commerce." *Id.,* at 607.
Perhaps this Court might decide *Napier* differently today.
The LIA lacks an express pre-emption clause, and "our
recent cases have frequently rejected field pre-emption in
the absence of statutory language expressly requiring it."
*Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*,
520 U. S. 564, 617 (1997) (THOMAS, J., dissenting). The

LIA contains no substantive regulations, let alone a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). Instead of relying on such indications of Congress' intent to oust state law, *Napier* implied field pre-emption from the LIA's mere delegation of regulatory authority to the Interstate Commerce Commission. Compare 272 U. S., at 612–613, with, *e.g., Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707, 717 (1985), and *New York State Dept. of Social Servs.* v. *Dublino*, 413 U. S. 405, 415 (1973). Nonetheless, *Napier*'s construction of the LIA has been settled law for 85 years, and "'[c]onsiderations of *stare decisis* have special force in the area of statutory interpretation.'" *Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197, 202 (1991).

Consistent with the values served by statutory *stare decisis*, however, it is important to be precise about what *Napier* held: *Napier* defined the pre-empted field as the physical composition of locomotive equipment. See 272 U. S., at 611 ("[T]he power delegated . . . by the [LIA] . . . extends to the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances"); *id.,* at 612 ("The federal and the state statutes are directed to the same subject—the equipment of locomotives. They operate upon the same object"); see also Act of June 7, 1924, §2, 43 Stat. 659 (making the LIA's standard of care applicable to the "locomotive, its boiler, tender, and all parts and appurtenances thereof"). Petitioners' defective-design claims fall within the pre-empted field because they would impose state-law requirements on a locomotive's physical makeup. See *ante,* at 7–8.

## II

Petitioners' failure-to-warn claims, by contrast, proceed on a fundamentally different theory of tort liability that does not implicate a product's physical composition at all. A failure-to-warn claim asks nothing of a product's design, but requires instead that a manufacturer caution of nonobvious dangers and provide instructions for safe use. Indeed, a product may be flawlessly designed and still subject its manufacturer or seller to liability for lack of adequate instructions or warnings. See, *e.g.,* Madden, The Duty To Warn in Products Liability: Contours and Criticism, 89 W. Va. L. Rev. 221 (1987) ("Although a product is unerringly designed, manufactured and assembled, injury or damage occasioned by its intended or reasonably foreseeable use may subject the seller to liability. Such liability may be found if the product has a potential for injury that is not readily apparent to the user" (cited in Restatement (Third) of Torts: Products Liability §2, Reporter's Note, Comment *i*, n. 1 (1997) (hereinafter Restatement)); see also Madden, 89 W. Va. L. Rev., at 221, n. 1 (collecting cases). Petitioners' complaint embodies just this conceptual distinction. Compare App. 22–23, ¶¶10(c)–(e), (g), with *id.,* at 25, ¶10(p).[1]

In the jurisdictions relevant to this suit, failure to warn is "a distinct cause of action under the theory of strict products liability." *Riley* v. *American Honda Motor Co.*, 259 Mont. 128, 132, 856 P. 2d 196, 198 (1993). Thus, "'a failure to warn of an injury[-]causing risk associated with the use of a technically pure and fit product can render such product unreasonably dangerous.'" *Ibid.;* see also, *e.g., Jahnig* v. *Coisman*, 283 N. W. 2d 557, 560 (S. D. 1979)

---

[1] Nor do petitioners' failure-to-warn claims allege that respondents' locomotive parts should have been altered, for example, by affixing warnings to the products themselves. See App. 22–23, ¶¶10(c)–(e), (g); *id.,* at 27, ¶12(d).

("In products liability suits based upon strict liability, . . . the product itself need not be defective. Where a manufacturer or seller has reason to anticipate that danger may result from a particular use of his product, and he fails to give adequate warning of such a danger, the product sold without such warning is in a defective condition within the strict liability doctrine"); *Greiner* v. *Volkswagenwerk Aktiengeselleschaft*, 540 F. 2d 85, 92–93 (CA3 1976) (finding that "failure to adequately warn of inherent or latent limitations in a product, which do not necessarily amount to a design defect" is "an independent basis of liability" under Pennsylvania law).[2]

Similarly, this Court has explained that a failure-to-warn claim is "narrower" than a claim that alleges a defect in the underlying product. *Wyeth* v. *Levine*, 555 U. S. 555, 565 (2009). Thus in *Wyeth*, this Court affirmed a state damages award based on a drug manufacturer's failure to provide sufficient warnings to clinicians against intravenous administration of the drug, but noted that it was unnecessary to decide "whether a state rule proscribing intravenous administration would be pre-empted." *Ibid.* Cf. *Bates* v. *Dow Agrosciences LLC*, 544 U. S. 431, 444 (2005) ("Rules that require manufacturers to design reasonably safe products . . . plainly do not qualify as requirements for 'labeling or packaging.' None of these common-law rules requires that manufacturers label or package their products in any particular way").

The majority treats defective-design and failure-to-warn claims as congruent, reasoning that each asserts a product defect. See *ante,* at 8–9 (citing Restatement §2(c) and

---

[2] Petitioners brought suit in Pennsylvania, but alleged that their decedent, George Corson, was exposed to asbestos at railroad maintenance and repair shops in Montana and South Dakota. *Id.,* at 42, ¶¶6–7. Because the District Court granted summary judgment on the issue of pre-emption, it performed no choice-of-law analysis to identify the applicable substantive state law. See App. to Pet. for Cert. 22a–39a.

Comment *l*). That may be true at a high level of generality, but "[d]esign and failure-to-warn claims . . . rest on different factual allegations and distinct legal concepts." Restatement §2, at 35, Comment *n*. For example, a manufacturer or seller cannot escape liability for an unreasonably unsafe design merely by issuing a warning. See *id.,* at 33, Comment *l* ("Warnings are not . . . a substitute for the provision of a reasonably safe design"). In a fundamental sense, therefore, a failure-to-warn claim proceeds by taking a product's physical design as a given. A failure-to-warn claim alleges a "defect" by asserting that a product, as designed, is safe for use only when accompanied by a warning—not that a product must be designed differently.

The majority further conflates defective-design and failure-to-warn claims by noting that each is "directed at" locomotive equipment. *Ante,* at 9. That is insufficient. Not every state law that "could be said to affect tangentially" matters within the regulated field is pre-empted. *English* v. *General Elec. Co.*, 496 U. S. 72, 85 (1990). Rather, "for a state law to fall within the pre-empted zone, it must have some direct and substantial effect" on the primary conduct of entities subject to federal regulation. *Ibid.* As explained above, the LIA regulates the physical equipment of locomotives. But petitioners' failure-to-warn claims, if successful, would have no necessary effect on the physical equipment of locomotives at all, as respondents themselves acknowledge. See Brief for Respondents 55 (petitioners' failure-to-warn claims "may not themselves literally mandate physical alteration of the locomotive's design or construction").

In the majority's view, a "duty to warn and the accompanying threat of liability will inevitably influence" a manufacturer's design choices. *Ante,* at 9, n. 4. But an "influence" is not the same as an "effect," and not every state law with some imaginable impact on matters within a federally regulated field is, for that reason alone, pre-

empted. See *English*, 496 U. S., at 85–86; *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 256 (1984). Indeed, the majority elides the distinction between indirect and direct regulation, even though this Court has explained that the two are not equivalent for pre-emption purposes. See *Goodyear Atomic Corp.* v. *Miller*, 486 U. S. 174, 186 (1988) ("Congress may reasonably determine that incidental regulatory pressure is acceptable, whereas direct regulatory authority is not"). State wage-and-hour laws, workplace safety standards, or tax credits for green technology, for example, could all "influence" the means and materials of locomotive equipment manufacture without imposing direct obligations. Nor does the majority substantiate its assertion that the "influence" exerted by a duty to warn need be "inevitabl[e]" or "substantial." *Ante,* at 9, n. 4. To the contrary, the requirements imposed by such a duty could be light, and the corresponding liability negligible, in comparison to the commercial value of retaining an existing design.

Respondents could have complied with state-law duties to warn by providing instructions for the safe maintenance of asbestos-containing locomotive parts in equipment manuals. See, *e.g.,* Baldwin-Lima-Hamilton Corp., Engine Manual for 600 Series Diesel Engines (1951), online at http://www.rr-fallenflags.org/manual/blh-6em.html (last visited Feb. 27, 2012, and available in Clerk of Court's case file). Or respondents could have ensured that repair shops posted signs. See Restatement §2, at 29–30, Comment *i* (duty to warn "may require that instructions and warnings be given not only to purchasers, users, and consumers, but also to others who a reasonable seller should know will be in a position to reduce or avoid the risk of harm"); see also, *e.g., Patch* v. *Hillerich & Bradsby Co.*, 361 Mont. 241, 246, 257 P. 3d 383, 388 (2011) ("While placing a warning directly on a product is one method of warning, other methods of warning exist, including, but

not limited to, issuing oral warnings and placing warnings in advertisements, posters, and media releases"). Neither step would encroach on the pre-empted field of locomotives' "physical elements." *Napier*, 272 U. S., at 612. The majority is therefore wrong to say that "the 'gravamen' of petitioners' failure-to-warn claims 'is still that [Corson] suffered harmful consequences as a result of his exposure to asbestos contained in locomotive parts and appurtenances.'" *Ante,* at 8–9 (quoting *Kurns* v. *A. W. Chesteron, Inc.*, 620 F. 3d 392, 398, n. 8 (CA3 2010)). Rather, the "gravamen" of these claims is that petitioners' decedent George Corson could have avoided the harmful consequences of exposure to asbestos while repairing precisely the same locomotive parts had respondents cautioned him, for example, to wear a mask.

Finally, preserving petitioners' failure-to-warn claims coheres with the LIA's regulatory regime. Neither the Interstate Commerce Commission, to which Congress first delegated authority under the LIA, nor the Federal Railroad Administration (FRA), to whom that authority now belongs, has ever regulated locomotive repair and maintenance. To the contrary, the FRA takes the position that it lacks power under the LIA to regulate within locomotive maintenance and repair facilities. Brief for United States as *Amicus Curiae* in *John Crane, Inc.* v. *Atwell*, O. T. 2010, No. 10–272, p. 10 ("[T]he field covered by the LIA does not include requirements concerning the repair of locomotives that are not in use"); Brief for United States as *Amicus Curiae* 13 ("The preempted field . . . does not include tort claims based on injuries arising when locomotives are not in use"). The FRA has determined that the Occupational Safety and Health Administration, not itself, bears primary responsibility for workplace safety, including with respect to hazardous materials. 43 Fed. Reg. 10583–10590 (1978); cf., *e.g., English*, 496 U. S., at 83, and n. 6. And the FRA has not promulgated regulations that

address warnings specific to maintenance and repair. Because the pre-empted field is congruent with the regulated field, see, *e.g., United States* v. *Locke*, 529 U. S. 89, 112 (2000), the majority's decision sweeps far too broadly.[3]

\*   \*   \*

In short, the majority affords the LIA field-pre-emptive effect well beyond what *Napier* requires, leaving petitioners without a remedy for what they allege was fatal exposure to asbestos in repair facilities. "It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." *Silkwood*, 464 U. S., at 251. That is doubly true in light of the LIA's "purpose . . . of facilitating employee recovery, not of restricting such recovery or making it impossible." *Urie* v. *Thompson*, 337 U. S. 163, 189 (1949).

I therefore concur in part and dissent in part.

---

[3] Disagreeing with the agency's interpretation, JUSTICE KAGAN concludes that the LIA empowers the FRA to require warnings as an incident of the authority to prescribe locomotive design. Compare *ante,* 2–3 (concurring opinion), with, *e.g.,* Tr. of Oral Arg. 22–23. Such power, if it exists, must be limited to warnings that impose direct requirements on the physical composition of locomotive equipment. Cf. n. 1, *supra*; 49 CFR §§229.85, 229.113 (2010). That may be a formal line, but it is the line that this Court drew in describing the scope of the authority conferred by the LIA, and therefore the pre-empted field. See *Napier* v. *Atlantic Coast Line R. Co.*, 272 U. S. 605, 611–612 (1926). And it is the line that separates petitioners' design-defect claims from their claims for failure to warn.